1
2
3
4
5
6

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

7

CARRIE A. ANDERSON, in her Personal
Capacity and as Personal Representative of the
ESTATE OF KIRK DANIEL POWLESS,
deceased; M.Q., a minor, by and through his
mother and general guardian, GINA
CAMPBELL; G.Q., a minor, by and through his
mother and general guardian, DEVIN
KASSELL; Y.Q., a minor, by and through her
mother and general guardian, DEVIN
KASSELL,

Plaintiffs,

v.

WHATCOM COUNTY, a political subdivision
of the State of Washington; BILL ELFO, in his
Personal Capacity; WENDY JONES, in her
Personal Capacity; VIOLET IGNASHOVA, in
her Personal Capacity; KYLE PRITCHARD, in
his Personal Capacity; STEWART ANDREWS,
in his Personal Capacity; and JOHN DOES 1-
10, in their Personal Capacities,

Defendants.

NO.   2:20-cv-01125-TSZ

**FIRST AMENDED COMPLAINT**

**JURY DEMAND**

8
9
10
11
12
13
14
15
16
17
18
19
20

Plaintiffs, by and through their attorneys of record, Ryan D. Dreveskracht and Gabriel S.

21

Galanda, of Galanda Broadman, PLLC, allege and claim as follows upon personal knowledge as to

22

themselves as to their own actions, and upon information and belief upon all other matters:

23
24
25

FIRST AMENDED COMPLAINT -  1

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

## I.    PARTIES

1.    Plaintiff CARRIE A. ANDERSON is the duly appointed Personal Representative of the Estate of her son, KIRK DANIEL POWLESS.  She brings suit in her Personal Capacity and as the Personal Representative of her son's Estate.  This is an action arising from Kirk's wrongful and unnecessary death and the Defendants' negligence, gross negligence, and deliberate indifference to his serious medical condition and conditions of confinement.  The claims herein include all claims for damages available under Washington and federal law to Kirk, his Estate, and all statutory and actual beneficiaries.

2.    M.Q. is Kirk's son.  He brings suit in his Personal Capacity, by and through his mother and general guardian, GINA CAMPBELL, and is entitled to damages for the loss of his father.

3.    G.Q. is Kirk's son.  He brings suit in his Personal Capacity, by and through his mother and general guardian, DEVIN KASSELL, and is entitled to damages for the loss of his father.

4.    Y.Q. is Kirk's daughter.  She brings suit in her Personal Capacity, by and through her mother and general guardian, DEVIN KASSELL, and is entitled to damages for the loss of her father.

5.    Defendant WHATCOM COUNTY is a political subdivision of the State of Washington.  Whatcom County has various departments including, but not limited to, the Whatcom County Sheriff's Office and its Bureau of Custody and Corrections Services, which operates the jail.  Whatcom County is, and was at all times mentioned herein, responsible for the actions or inactions, and the policies, procedures, and practices/customs of all correctional health services relating to the Whatcom County Jail ("Jail").  Whatcom County cannot contract-away its obligation to keep inmates in its custody in health and free from harm.  Whatcom County is legally liable for

FIRST AMENDED COMPLAINT - 2

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    the breach of this duty by such providers. *West v. Atkins*, 487 U.S. 42, 56 (1988).  As a local

2    government, Whatcom County is a "person" under 42 U.S.C. § 1983 and may be sued for

3    constitutional injuries. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978).

4    Defendant Whatcom County, its jailers, and jail administrators—named and unnamed, identified

5    and unidentified—are hereafter identified collectively as "Whatcom County."

6         6.    Defendant BILL ELFO is the Whatcom County Sheriff.  He is sued in his Personal

7    Capacity.  Defendant Elfo is a policymaker and supervisor responsible for the enactment and

8    implementation of policies, practices, and customs relating to all aspects of the Jail.

9         7.    Defendant WENDY JONES is the Whatcom County Jail Chief.  She is sued in her

10   Personal Capacity.  Defendant Jones is a policymaker and supervisor responsible for the enactment

11   and implementation of policies, practices, and customs relating to all aspects of the Jail.

12        8.    Defendant Deputy VIOLET IGNASHOVA is an employee of Whatcom County.  As

13   a jailer and not a healthcare professional, Defendant Ignashova's role is to serve as a gatekeeper for

14   medical personnel capable of treating inmates.  She is sued in her personal capacity.

15        9.    Defendants JOHN DOE 1, KYLE PRITCHARD and DR. STEWART ANDREWS

16   are employees and/or subcontractors of Whatcom County.  They are healthcare professionals tasked

17   with providing medical and/or mental healthcare to Whatcom County inmates.  They are sued in

18   their personal capacities.

19        10.   Defendants JOHN DOES 2 - 10 are subcontractors, employees, and/or agents of

20   Whatcom County. Each JOHN DOE 2 - 10 was within the scope of his/her employment at all times

21   relevant hereto. Each JOHN DOES 2 - 10 was negligent; acted in furtherance of an official and/or

22   *de facto* policy or procedure of negligence; and/or were responsible for the promulgation of the

23   policies and procedures and permitted the customs/practices pursuant to which the acts alleged

24

25

FIRST AMENDED COMPLAINT - 3

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

herein were committed.  Their identities are unknown at this time and will be named as discovery progresses.

11.     Each and every Defendant was personally involved in Kirk's constitutional deprivations in that they: (1) participated directly in the alleged constitutional violation; (2) after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred, allowed the continuance of such a policy or custom, or ratified the acts of subordinates thereby establishing a policy or custom; (4) was grossly negligent in supervising subordinates who committed the wrongful acts; and/or (5) exhibited deliberate indifference to Kirk's rights by failing to act on information indicating that unconstitutional acts were occurring.

## II.      JURISDICTION AND VENUE

12.     This action arises under Washington State's wrongful death law and the Constitution and laws of the United States, including 42 U.S.C. § 1983.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

13.     Venue is proper in the Western District of Washington pursuant to 28 U.S.C.§ 1391(b)(1) and (b)(2).  Whatcom County is located in this District, and the events and omissions giving rise to the claims in this action occurred in this District

## III.     STATUTORY COMPLIANCE

14.     On May 18, 2020, Plaintiff filed an administrative claim for damages with Whatcom County.  More than sixty days (60) have elapsed since the filing of that administrative claim.  Plaintiffs have satisfied the prerequisites to the maintenance of this action per Chapter 4.92 RCW.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

## IV.    STATEMENT OF FACTS

**A.    PREVIOUS INCARCERATIONS**

15.    Kirk Powless was not unfamiliar with the Jail; nor was the Jail unfamiliar with Kirk's suicide, self-harm, and mental health issues.

16.    In 2008, for instance, Kirk egged other inmates to physically harm him, telling jailers afterward, "'I'm crazy, I have mental issues.'"   He was diagnosed by a Jail psychiatrist with schizophrenia and prescribed Seroquel—he was hearing "voices" that told him "to do something dramatic."   Jail medical records note: "Mental health issue: He invites self harm."

17.    In November of 2013 Kirk was hospitalized at PeaceHealth St. Joseph Medical Center ("St. Joseph's") for attempting suicide.   Kirk disclosed this to Jail medical providers in October of 2014, where his chart notes indicate that "he suffered from severe depression with impulsive drug induced suicidality" and that "he had attempted suicide about 6 times over the past year."   He also had noticeable and obvious suicide-attempt scars on both of his forearms.

18.    Jail and medical staff also knew of Kirk's "history with poly substance abuse."   As early as 2008, Kirk notified Jail and medical staff that he was "withdrawing from heroin."   On June 8, 2008, Kirk wrote in a medical request: "I'm addicted 2 heroin. Need help detoxin please."   Kirk's subsequent intake screenings indicate that he informed Jail and medical staff that he was detoxing from heroin each succeeding incarceration.

19.    As summarized in the County's Critical Incident Review ("CIR"), the Jail's records indicated that:

> [Powless had] a history of Bipolar Disorder, PTSD, ADHD, Anxiety, depression, polysubstance abuse, and suicidal ideation. . . . [In] a chart note in 2014. . . Powless interacted with Mental Health who noted that Powless suffered from severe depression with impulsive drug induced suicidality . . . . Records from St. Joseph's Hospital indicate that Powless was hospitalized in 2013 for suicidal ideation when he attempted to overdose with Xanex and later wanted to OD with heroin but fell asleep before he could complete the attempt.

FIRST AMENDED COMPLAINT - 5

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

**B.    KIRK'S FINAL INCARCERATION**

20.    Kirk was arrested by the Bellingham Police Department on May 30, 2018.

21.    During a search incident to arrest, the arresting officer found a brown tacky substance in his pocket, which tested positive for heroin.

22.    After being read his Miranda rights, Kirk admitted to the arresting officer that he is a daily heroin user—something that the Whatcom Sheriff's Department already knew because of previous interactions with him, as far back as at least as of February of 2016.

23.    Kirk was then transported to the Jail, where it was determined that because of an injury to his wrist and an "abscess in his buttocks" that caused him to have "limited balance," Kirk needed to be taken to St. Joseph's for a "fit for jail."  Kirk's injuries were evaluated by Dr. Stephen Buetow, and he was discharged "with paperwork to give to the Jail."

24.    Included in the paperwork from St. Joseph's were medical records indicating that Kirk had previously presented to the St. Joseph's Emergency Room with "suicidal ideation." Specifically, the records indicated that Kirk had "overdos[ed] on 30 over the counter sleeping pills and 16 xanax . . . in an attempt to end his life" and that prior to that, Kirk attempted suicide by hanging, but ingested heroin and "fell asleep prior to completing his suicide plan."  The records also indicated that Kirk's stated reason for his previous suicide attempts were related to "fears about detoxing from heroin without medication that would help to calm his extreme anxiety."

25.    Kirk was eventually booked and underwent a cursory medical and mental health screening *over the phone*, conducted by Defendant Kyle Pritchard.  Defendant Pritchard indicated therein, in relevant part:

| | | |
|---|---|---|
| **7. Is this person obviously injured?**<br>Yes<br>Injury to right hand | **10. Are you in pain?**<br>Yes<br>right hand | **21. Do you have Hepatitis?**<br>Yes<br>hep c |
| **8. Are you under a doctor's care?**<br>Yes<br>absess on left butt cheek | **11. Are you currently bleeding?**<br>Yes<br>absess on buttocks | **22. Have you ever had a positive TB skin test?**<br>No<br><br>**23. Do you use street drugs: Note the type and amount**<br>Yes<br>heroin last used a few hours ago about 1 gram a day |

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

26.     Nurse Pritchard did not review the medical records sent from St. Joseph's or Kirk's medical chart, which included—in addition to a number of serious mental health diagnoses and previous suicide attempts—the following Problem List, contraindicating a number of Kirk's answers:

Whatcom County Jail
## Problem List

| Last Name Powless | | First Name Kirk | M.I. D |
| --- | --- | --- | --- |
| D.O.B. 10-2-80 | CIN | Allergies/Adverse Reactions ☐ NKDA | |
| | | Drug/Food | Type of Reaction |
| Active and Chronic Disease Problem List | | Food Toradol | GI upset |
| Hepatitis C (Per pt) | | | |
| Poly substance Abuse (opioids, heroin, meth) heroin cocaine | | | |
| PTSD, ADHD, anxiety | | | |
| Asthma | | | |
| Elevated BP | | Surgeries/Procedures | Date |
| Poor vision | | Cystoscopy w/ urethral stent | 8-9-17 |
| GERD | | | |
| dentures | | | |
| Bipolar | | ALERTS: | |
| Urinary Retention | | | |
| SI 11/13 → OD'd OC meds & xanax | | | |

27.     Despite knowing that Kirk was a daily heroin user, and that he was arrested with heroin on his person, Whatcom County did not implement any kind of detox protocol for Kirk or classify him as a special needs inmate.

28.     At the time, it was Whatcom County's policy and practice to deny medically appropriate treatment to heroin users.

29.     This was also in violation of the County's written policy on Suicide in the Jail Setting, which would have identified Kirk at a "HIGH risk of suicide."

30.     That policy reads, in relevant part:

Inmates are asked about their suicidal history and ideation when they are booked into jail. This occurs each and every time. Any past history of suicide attempts, even as a juvenile is carried forward and special attention is placed on this. It

FIRST AMENDED COMPLAINT - 7

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

triggers an automatic referral to mental health, regardless if the inmate states if they want it or not. . . . Inmates are at HIGH risk of suicide if: . . .

• They have drug and alcohol issues, **especially heroin withdrawal** . . .

• There is a history of previous attempts . . .

• They are mentally ill

31.    It was not until Whatcom County was sued over its detoxification policy—an ironic 4 days after Kirk's death—the Whatcom County changed its policy.  Complaint, *Kortlever v. Whatcom County*, No. 18-0823 (W.D. Wash. Jun. 6, 2018), Dkt. # 1.

32.    As a result of the *Kortlever* litigation, Whatcom County now has an opiate withdrawal policy, a medication assisted treatment for opioid use disorder maintenance policy, and a medication-assisted treatment for opioid use disorder induction policy. *Id.* Dkt. # 35-1. But these policies are too little, too late, for Kirk.

33.    On June 2, 2017, the records from St. Joseph's—which, as discussed above, included specific information regarding Kirk's onset of suicidality due to non-medicated detox and serious mental illnesses—were reviewed by Defendant Stewart Andrews.  Dr. Andrews did nothing in response.

34.    At booking, Kirk was assigned cell A-4 of the module 2A.  Although A-4 is meant to house two inmates, Kirk was housed alone.

35.    On June 3, 2017, citing Kirk's history of suicide attempts and bipolar diagnosis, John Doe 1—an as-yet unidentified mental health provider—called Kirk to conduct a mental health and suicide assessment *over the phone*.  Not interested in the probing telephone conversation within earshot of his fellow inmates, Kirk hung up the phone, as he had in the past.

36.    Notably, *Kirk was not seen in person by a medical or mental health provider his entire final incarceration*.  Had he been, there more likely than not would have been a different outcome—but the Jail's established practices dictated otherwise.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

37.     On June 4, 2018, Defendant Ignashova was assigned as a Floor Deputy on the second floor, which included module 2A and Kirk's cell A-4.

38.     Per Jail Policy No. 111, a single Floor Deputy is responsible for oversight, management, and security of the entire second floor.

39.     Per Jail Policy No. 304, as the sole Floor Deputy Defendant Ignashova was responsible for completing and logging in a "floor log" *all* of the following duties:

- Supervision of all activities including visitors to the floor.
- Safety of personnel and security of the floor.
- Proper operation of controls, security features and safeguards.
- Initiate and complete a floor log.
- Meal service (Policy 305 - Inmate Head Counts and Name Verification).
- Medication delivery (Policy 308 - Medication Delivery and Documentation).
- Stocking and maintenance of medical cart.
- Dress out and briefing of incoming inmates.
- Dress out of released inmates and collection of jail property.
- Inmate daily cleaning (Policy 124 - Facility Sanitation).
- Inmate head counts (Policy 305 - Inmate Head Counts and Name Verification).
- Security checks (Policy 306 - Security Checks).
- Responding to call lights and emergencies.
- Intensive cleaning/cell inspections (Policy 317 - Contraband Control)
- Razor issue (Policy 317 - Contraband Control).
- Collection and delivery of inmate laundry (Policy 127 - Laundry Services).
- Movement of inmates (Policy 323 - Movement of Inmates, Policy 506 - Attorney Visits).
- Process and deliver mail (Policy 507- Inmate Mail - Personal; Policy 508 - Inmate Mail – Legal).
- Collection, routing and delivery of blue slips and health request slips.
- Respond to valid inmate needs and requests.
- Ensure the floor is maintained clean and in good order.

40.     As to "Security Checks" specifically, Jail Policy No. 306 reads as follows, in relevant part:

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Deputies assigned to the main jail and working second or third floor will conduct security checks a minimum of once per hour.  Security checks will include:

- A visual inspection of each module.
- A visual inspection for any obvious problems.
- A visual inspection verifying inmate welfare.

Deputies will document all security checks in their daily floor logs.

Deputies assigned to the main custody floor of the jail work center will conduct security checks every hour.  Deputies performing the security checks will enter and walk through each module, documenting the above checks in the work center shift log.

41.     In practice, though, "cell checks" at the Jail are nonexistent.  The jailers generally do not enter the unit or look into the cells.  At times, jailers walk by the unit and peer through the window, where they can see some of the open area.  But much of the unit, including numerous cells, are obstructed and cannot be observed by peering through the window into the unit.

42.     On June 4, 2017, aside from when breakfast was served at around 5:30 a.m., not a single jailer, medical provider, mental health provider—nobody—entered module 2A to conduct a "cell check" that involved looking into the individual cells prior to Kirk's death.

43.     According to Defendant Ignashova, at 8:00 a.m. she "called into 2A04 for [Kirk] to come get his medication" to which he responded, "I don't have any meds, don't want any meds." This is the last anyone would hear from Kirk.

44.     Over two hours later, at 10:05 a.m., Kirk tied a knot on the end of his shirt, hung the knotted side on the outside of his cell door, and closed the door.

45.     Kirk then put his head inside of a loop of his shirt and hanged himself.

46.     Kirk, and the bright white t-shirt that he was hanging from, were visible from outside of module 2A, through the window of the module and the window in his door.

JEFFERSON 000165

47.     But because Defendant Ignashova *did not conduct a single safety check during her entire shift*, Kirk was not discovered until shortly before 11:00 a.m.

FIRST AMENDED COMPLAINT -  10

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

48.     Shortly before 11:00 a.m., an inmate walking by Kirk's cell discovered him hanging from the t-shirt by looking into the window on his cell door.  The inmate then ran over to the window of module 2A, where he immediately notified Defendant Ignashova—whose response was shockingly nonchalant.

49.     According to the inmate who discovered Kirk:

[W]e ran up to the window, started bangin' on the window, and IGNASHOVA was like, we're like, "Come 'ere, come 'ere." We're tellin' her, "Come 'ere," and she kinda was just like, she kinda stood up for second and then like kinda fiddled with somethin' on her desk; continued doin' what she was doin', and then she just kinda took 'er time to come over to the window.  And I'm yellin' through the hatch, "This dude hung himself. This dude hung himself." So she gets over there and she's standin' at that window, lookin' in, and you could kinda see from the, the main, the big window in the s-, in the unit, you kinda see into his house. I'm pretty sure that she could see he was, you know what I mean, and then she see the, the sheet on the door, you know.

50.     And as described by Defendant Ignashova herself: "[A]t about roughly 11:00 I was sitting at the desk uh, typing up some logs uh, and the inmate in 2A was banging on the window, I look over, he's standing there kind of waving his hands, so I *walk* over there to see what's needed" (emphasis added).

51.     Meanwhile, other inmates immediately tried to rescue Kirk, but the door to his cell had locked when he shut the sheet in the door.

52.     A dangerous condition of confinement at Whatcom County is that when a door is opened, then subsequently closed, the door locks and it must be unlocked remotely, by Jail Control.

53.     Defendant Ignashova at this point chose to make the inmates go into their cells and "lock down" instead of allowing them to rescue Kirk.

54.     As described by one inmate:

[W]e're tryin' to get her to pop the four house, and my buddy, FROST, was standin' at the door, tryin' to untie the knot on the door, and he's tellin' 'er, "Pop four house. Pop the door. Pop the door.," you know, and she just was tellin' everybody to, "Lock down. Lock down." We kept tellin' 'er, "Unlock, just unlock the fuckin' door."

FIRST AMENDED COMPLAINT - 11

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

55.     Once Defendant Ignashova finally got to Jail Control, where Kirk's door could be unlocked, the door would not open.

56.     As Defendant Ignashova put it: "I went to the panel, . . . started popping the door, but it was kind of jammed."

57.     This was not uncommon.  Whatcom County had known for years that once locked, the doors to cells at the Jail would often be difficult to reopen.

58.     According to testimony given by Defendant Wendy Jones on February 15, 2018:

**Counsel**: Was there an issue . . . with doors being locked and being difficult to open?
**Defendant Jones**: That has happened, yes.
**Counsel**: Okay.  Was that the case with some of the doors in March of 2014?
**Defendant Jones**: Yes.

59.     Whatcom County and its policymakers were also aware that the doors "sticking" also contributed to the suicide death of at least one inmate.  Complaint, *Jefferson v. Whatcom County*, No. 16-2-01257-7 (Whatcom Cty. Super. Sept. 19, 2016), at 8-9.

60.     At 11:07 a.m.—over seven minutes since Defendant Ignashova was notified that Kirk was hanging—Defendant Ignashova and other Jail Deputies ***walked*** into module 2A, where Kirk lay on the floor of his cell, alone:



FIRST AMENDED COMPLAINT -  12

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

61.     Jail medical staff arrived shortly thereafter and for some reason administered Narcan, a medication used to block the effects of opioids.

62.     Paramedics arrived a few minutes later.  Their attempts to provide lifesaving aid were unsuccessful.

63.     An autopsy was conducted on June 5, 2018.  Whatcom County Medical Examiner found the cause of Kirk's death to be "asphyxia by ligature hanging" with "illicit substance usage" as a contributory factor.   "Aspects of the brain indicated abnormal (low) dopamine levels" indicating that Kirk was experiencing severe withdrawal.

64.     Kirk was survived by his three children, Plaintiffs M.Q., G.Q., and Y.Q.:



C.     **POLICIES AND ESTABLISHED PRACTICES THAT CAUSED KIRK'S DEATH.**

65.      In addition to those identified above, the following policies and established practices at the Jail significantly contributed to Kirk's death.

66.     In the five years preceding Kirk's successful suicide, three other inmates suffered the same fate: Shannon Jefferson on March 10, 2014; Eric Aybar on March 8, 2014; and Timothy Drafs on May 28, 2015.  One more inmate, Paula Jefferson, passed away due to withdrawal complications on August 10, 2017.

FIRST AMENDED COMPLAINT -  13

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

67.     In subsequent investigations into each of the deaths in the preceding paragraph 64, Defendant Jones, Elfo, and other Jail supervisors and policymakers concluded that that staff acted appropriately during their interactions with the decedents and that involved staff acted within Whatcom County's guidelines, policies and procedures.

68.     Because the Jail's pre-booking area is insufficient to ensure medical confidentiality, the Jail had an established practice of obtaining insufficient medical screenings—which were administered by non-health trained Jail employees.  That this configuration would lead to inmate harm and delays or lapses in medical care was well-known to Jail supervisors.  As Defendant Jones herself wrote in a recent budget request:

> Our current practice is to ask a series of health screening questions while the offender is waiting, with the arresting officer, in the pre-booking area of the jail. Because this space is on the other side of the security perimeter, questions are asked over a microphone/speaker arrangement, with the Deputy on one side of a thick, impact resistant window and the offender on the other.  This means anyone in the prebooking area can hear both the questions and the response.  Questions cover everything from medications to history of communicable diseases and behavioral health issues.  No[t] surprisingly, offenders are often reluctant to share that information, which can lead to delays in treatment.

69.     If jailers did complete safety checks—which they often did not—they routinely did not conduct direct visual observation of all inmates.  Rather, jailers interpreted the Jail's policy as allowing them just to peek into the window of the module, without observing inmates in their cells. This interpretation was accepted and approved by Whatcom County supervisors, including Defendants Elfo and Jones.  This interpretation was allowed because jailers are undertrained on safety check policy.

70.     Whatcom County had a policy of overcrowding.

71.     Whatcom County and its policymakers set into place a policy, custom, or practice of failing to follow the staffing guidelines as set forth in the standards published by the National Commission on Correctional Healthcare.

FIRST AMENDED COMPLAINT - 14

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

72.     Whatcom County and its policymakers set into place a policy, custom, or practice of not referring inmates and detainees suffering severe withdrawal symptoms to licensed acute care facilities and/or hospital settings.

73.     Whatcom County and its policymakers set into place a policy, custom, or practice of failing to follow monitoring guidelines relating to medical detoxification.

74.     Whatcom County and its policymakers set into place a policy, custom, or practice of failing to establish and carry out a continuous quality improvement program, including a quality improvement committee.

75.     Whatcom County and its policymakers set into place a policy, custom, or practice of failing to meet widely accepted community standards of care with regard to medical services for ill or injured inmates and detainees of the Jail.

76.     Whatcom County and its policymakers set into place a policy, custom, or practice of failing to hold regular staff meetings to monitor, plan, or resolve problems with healthcare delivery.

77.     Whatcom County has one of the highest use rates of opioids in the state of Washington.  Yet Whatcom County has one of the laxest intake contraband search policies in the state.  It has been well known at Whatcom County, for years, that (1) the presence of smuggled opiates creates a significant risk of serious harm and/or death to inmates; and (2) the only reliable method for detection of contraband being smuggled in by arrested persons is by the use of a body scanner.  Despite experiencing a death and a number of near-deaths, assaults, and fights (including one that resulted in 3 female offenders going to prison), due to the introduction of drugs into the facility, the Jail has yet to employ the use of a body scanner to ensure that drugs are not smuggled into the facility.  Whatcom County's and its policymakers' maintenance of this policy, despite its

FIRST AMENDED COMPLAINT - 15

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1   known and obvious detrimental consequences, constitutes negligence, gross negligence, and

2   deliberate indifference.

3       78.    The Jail has a policy of collecting a $5 fee from inmates for all sick calls—meaning

4   that inmates are charged for providing a service that the Jail is legally bound to provide free of cost.

5   The fact that most pretrial detainees are insolvent, combined with this policy, results in a known

6   and obvious disinclination on the part of inmates to put in formal requests for medical care and an

7   increased risk of serious harm or death.

8       79.    The Jail is constantly understaffed.  Deputies are routinely unable to complete tasks

9   without interruption, and must work on several different tasks simultaneously, which increases

10  errors and reduces safety.  Sergeants perform as working supervisors, completing not only the

11  administrative function of a first level supervisor, but assisting the Deputies in the routine tasks of

12  the jail.  Staffing is spread so thin that many routine functions, such as security checks, are not

13  performed.  Mandatory training and staff supervision are also difficult due to the Jail's understaffed

14  condition.  All of which results in an increased risk of harm or death to inmates.

15      80.    The Jail's policy of requiring a single floor deputy to complete an unrealistic number

16  of tasks, as reflected in Jail Policy No. 304, results in an increased risk of harm or death to inmates.

17      81.    The Jail does not have separate spaces for confidential medical examinations,

18  counseling, treatment, and procedures.  Not surprisingly, inmates are often disinclined to submit to

19  treatment in these conditions, which causes delays in treatment—which leads to serious injury and

20  death.  All of which is well known to Whatcom County and its policymakers.

21      82.    Defendant Elfo has publicly admitted that the Jail does not have the "space to

22  appropriately house and treat those with medical and behavioral health issues," a condition of

23  confinement that obviously puts inmates in medical need at an increased risk of serious harm and

24  death.  Bill Elfo, *Here's What Sheriff Says of Whatcom County Jail Booking Restrictions*,

25

FIRST AMENDED COMPLAINT - 16

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Bellingham Herald, Jul. 23, 2016, *available at* https://www.bellinghamherald.com/opinion/op-ed/article91348812.html.

83.   The Defendants' lack of clear delineation of authority and inadequate means of communication with respect to assessing medical risks was an additional policy that caused their failure to prevent Kirk's pain, suffering, and death.  In essence, there is a "who's on first" problem at the Jail where an established practice of non-communication to one another or amongst themselves in regard to inmate medical safety has been implemented.

84.   It is a common and widespread practice at the Jail to ignore information related to healthcare in a measured attempt to avoid liability in a deliberate indifference action, by claiming a lack of knowledge.

85.   Defendants maintained a policy of using cursory health screening that essentially amounted to no screening at all for incoming inmates.

86.   Whatcom County's official policies have remained static for decades.   This, in and of itself created a significant risk of serious harm.  The danger in lack of a more frequent review of policies is that they are not kept current with the emerging body of knowledge that guide most competent corrections officials.  Whether standards have changed as a result of litigation or due to advancements in correctional knowledge, policies without frequent review are behind the times and inadequate to provide sufficient guidance to facility staff, as is the case with the policies of the Jail.

87.   Some of the above-discussed policies were changed *after* Kirk's death.  While it is worthy that Whatcom County has finally addressed these grievous deficiencies, that these "policies were drafted because of an awareness that the pre-existing policies were substantially likely to lead to a violation of citizens' rights" is a reason for liability, not a defense thereto.  *Haberle v. Borough of Nazareth*, No. 18-3429, 2019 WL 4065031, at *3 (3d Cir. Aug. 29, 2019) (quotation omitted).

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

88.     A death in a correctional facility is a very serious incident.  A death by suicide typically causes an incident review to occur which includes a complete accounting of what happened, what lesson can be learned from the event and what changes need to be made in order to decrease the likelihood that it occurs again.  Had Whatcom County officials had an adequate policy in place to review previous incidents of in-custody deaths, accommodations could have been made that would have kept Kirk safe and alive.

89.     The County has an unofficial policy of allowing inmates who are booked wearing "white t-shirts" to continue wearing this article of clothing, which can easily be used to create a ligature.  This policy is maintained despite the County's written policy, which requires an inmate to be "dress[ed] out . . . into jail clothing" and allows only the following personal clothing items to be retained:

- Underwear. Three sets including long johns.
- Socks
- Sweat clothing purchased from commissary.
- Personal sweats worn at time of arrest.  Must be light gray in color and contain no strings or markings of any type.
- Underwear worn at time of arrest.

Here, as discussed above, Kirk was not dressed into a jail shirt, as required by formal policy. Instead, the unofficial policy of allowing inmates who are booked wearing "white t-shirts" to continue wearing this article of clothing was implemented, which allowed Kirk to use his shirt as a ligature.

90.     Because of the policy that "at no time are deputies permitted to enter inmate tanks alone," systematic failures in implementing cell checks every hour have resulted, discussed above. In addition, the required rigidity of this policy requires that deputies stand and watch an inmate hang to death while precious lifesaving seconds tick by as they await backup, like Defendant Ignashova did in regard to Kirk, discussed above.

WC01431

FIRST AMENDED COMPLAINT - 18

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

91.     All of the acts and omissions taken in regard to the care and custody of Kirk were in accordance with Whatcom County's established practices and/or were ratified by these entities' policymakers.

## V.     CLAIMS

A.     FIRST CAUSE OF ACTION – NEGLIGENCE

92.     Defendant Whatcom County had a nondelegable duty to care for pretrial detainees and to provide reasonable safety and medical care.

93.     This duty extends to foreseeable medical harms.

94.     This duty exists because pretrial detainees, by virtue of incarceration, are unable to obtain medical care for themselves.

95.     Whatcom County breached this duty, and was negligent, when it failed to have and follow proper training, policies, and procedures on the assessment of persons with medical needs.

96.     Whatcom County breached this duty, and was negligent, when it failed to adequately treat Kirk's medical need for detoxing.

97.     Whatcom County breached this duty, and was negligent, when it failed to ensure adequate and proper staffing at the Jail.

98.     Whatcom County breached this duty, and was negligent, when it failed to ensure that Kirk was properly supervised and that cell checks were conducted in a safe and consistent manner.

99.     Whatcom County breached this duty, and was negligent, when it failed to properly assess and treat Kirk prior to his death.

100.     As a direct and proximate result of the breaches, failures, and negligence of Whatcom County, as described above and in other respects as well, Kirk died.

101.     Kirk suffered unimaginable pre-death pain, suffering, embarrassment, and terror.

FIRST AMENDED COMPLAINT - 19

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    102.    As a direct and proximate result of the breaches, failures, and negligence of

2    Whatcom County, as described above and in other respects as well, Plaintiffs have incurred and

3    will continue to incur general and special damages in an amount to be proven at trial.

4    103.    As a direct and proximate result of the negligence of Whatcom County, Kirk's

5    children have suffered the loss of familial association with their father.  Plaintiffs have suffered and

6    continue to suffer grief and harm due to mental and emotional distress as a result of Kirk's wrongful

7    death.

8    **B.    SECOND CAUSE OF ACTION – 42 U.S.C. § 1983 (*MONELL*)**

9    104.    The acts and failures to act described above were done under color of law and are in

10   violation of 42 U.S.C. § 1983, depriving Plaintiffs of their civil rights.

11   105.    At the time Kirk was detained by Whatcom County, it was clearly established in the

12   law that the Fourteenth Amendment imposes a duty on jail officials to provide humane conditions

13   of confinement, including adequate medical care, and to take reasonable measures to guarantee the

14   safety of the inmates.

15   106.    Defendant Whatcom County and its policymakers knew of and disregarded the

16   excessive risk to inmate health and safety caused by the inadequate formal and informal policies,

17   including a lack of training, staffing, funding, and supervision, as identified above.

18   107.    Defendant Whatcom County and its policymakers knew of this excessive risk to

19   inmate health and safety because it was obvious and because numerous other inmates had been

20   injured and/or killed as a result of these grossly inadequate policies and in the past.

21   108.    Defendant Whatcom County and its policymakers knew of this excessive risk to

22   inmate health and safety because they were identified as precipitating factors to the in-custody death

23   of other inmates who have died in recent years at that Jail and were the subject of lawsuits and/or

24   civil claims.

25

FIRST AMENDED COMPLAINT -  20

109.    Defendant Whatcom County and its policymakers were responsible for a policy, practice, or custom of maintaining a longstanding constitutionally deficient safety and medical and mental health care, and training thereon, which placed inmates like Kirk at substantial risk, as discussed above.

110.    There was little to no supervision of Kirk and inmates like him because Defendant Whatcom County and its policymakers maintained a known policy and custom of understaffing, overcrowding, and dangerous policies, as discussed above.

111.    Indeed, even without the previous in-custody injuries, deaths, and near-deaths, it was obvious that the above-identified policies and established practices would result in the harm caused here.  Defendant Whatcom County and its policymakers were (1) expressly informed that many of their official policies were being ignored and that their unofficial or *de facto* policies would result in inmate deaths, yet deliberately did nothing to address these unofficial or *de facto* policies; and (2) that many of their official policies would result in inmate deaths, yet deliberately did nothing to address them.

112.    Defendant Whatcom County and its policymakers knew of and disregarded the excessive risk to inmate health and safety caused by their failure to provide reasonable and necessary medical care and treatment.

113.    This callousness reflects a custom, pattern, and/or policy wherein Defendant Whatcom County and its policymakers either intentionally violated or were deliberately indifferent to the health, welfare, and civil rights of Kirk and his fellow inmates.

114.    As a direct and proximate result of the and unconstitutional conditions of confinement and deliberate indifference of Defendant Whatcom County and its policymakers, as described above and in other respects as well, Kirk died a terrible and easily preventable death.  He suffered pre-death pain, anxiety, and terror, before leaving behind a loving family.

FIRST AMENDED COMPLAINT - 21

115.    As a direct and proximate result of the deliberate indifference of Defendant Whatcom County and its policymakers, Plaintiffs have suffered the loss of familial association with Kirk, in violation of their Fourteenth Amendment rights.  Plaintiffs have suffered and continue to suffer extreme grief and harm due to mental and emotional distress as a result of Kirk's wrongful death.

**C.    THIRD CAUSE OF ACTION – 42 U.S.C. § 1983 – ALL INDIVIDUALLY NAMED DEFENDANTS, INCLUDING DEFENDANTS JOHN DOE 1-10.**

116.    The acts and failures to act described above were done under color of law and are in violation of 42 U.S.C. § 1983, depriving Plaintiffs of their civil rights.

117.    Each individually named Defendant was subjectively aware that Kirk was in need of medical assistance because of a serious medical condition.

118.    From the evidence presented above, a reasonable jailer and/or healthcare provider would have been compelled to infer that a substantial risk of serious harm existed.  Indeed, each individually-named Defendant did infer that a substantial risk of serious harm existed, but failed to take any steps to alleviate this risk.  And Kirk died as a result.

119.    Each individually-named Defendant displayed deliberate indifference when they:

a.    Failed to provide prompt medical attention to Kirk's serious medical needs.

b.    Failed to have and/or follow a detoxification program.

c.    Failed to follow the standards as published by the National Commission on Correctional Healthcare.

d.    Failed to administer intravenous therapy at any time prior to the time of Kirk's death.

e.    Failed to conduct a safety check at any time prior to the time of Kirk's death.

f.    Seriously aggravated his condition by failing to provide adequate staffing levels needed for minimally adequate care.

FIRST AMENDED COMPLAINT - 22

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

g.  Seriously aggravated his medical condition by allowing medical staff to operate without benefit of physician supervision.

h.  Failed to respond to a medical emergency.

120.  Kirk's in-custody death is "without doubt, sufficiently serious to meet the objective component" of the deliberate indifference test. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).

121.  Pre-death, Defendant Ignashova failed to follow policy for security checks, which are intended to prevent inmate suicides. *See, e.g., In re: Estate of Rice*, 675 F.3d 650, 679 (7th Cir. 2012) ("If no checks were made, a factfinder certainly could conclude that the guards who were required to make those checks were indifferent to the concerns underlying the rule mandating those checks.").

122.  As a direct and proximate result of the deliberate indifference of each individually named Defendant, as described above and in other respects as well, Kirk died a terrible and easily preventable death.  He suffered pre-death pain, anxiety, and terror, before leaving behind a loving family.

123.  As a direct and proximate result of the deliberate indifference of each individually named Defendant, Plaintiffs have suffered the loss of familial association with Kirk, in violation of their Fourteenth Amendment rights.  Plaintiffs have suffered and continue to suffer extreme grief and harm due to mental and emotional distress as a result of Kirk's wrongful death.

124.  Each individually named Defendant has shown reckless and careless disregard and indifference to inmates' rights and safety, and are therefore subject to an award of punitive damages to deter such conduct in the future.

## VI.    AMENDMENTS

125.  Plaintiff hereby reserves the right to amend this First Amended Complaint.

FIRST AMENDED COMPLAINT - 23

## VII.   RELIEF REQUESTED

126.   Damages have been suffered by all Plaintiffs and to the extent any state law limitations on such damages are purposed to exist they are inconsistent with the compensatory, remedial and/or punitive purposes of 42 U.S.C. § 1983, and therefore any such alleged state law limitations must be disregarded in favor of permitting an award of the damages prayed for herein.

127.   WHEREFORE, Plaintiffs request a judgment against all Defendants:

(a)  Fashioning an appropriate remedy and awarding general, special, and punitive damages, including damages for pain, suffering, terror, loss of consortium, and loss of familial relations, and loss of society and companionship under Washington State law and pursuant to 42 U.S.C. §§ 1983 and 1988, in an amount to be proven at trial;

(b)  Awarding reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, or as otherwise available under the law;

(c)  Declaring the defendants jointly and severally liable;

(d)  Awarding any and all applicable interest on the judgment; and

(e)  Awarding such other and further relief as the Court deems just and proper.

Respectfully submitted this 27th day of January, 2020.

GALANDA BROADMAN, PLLC

s/Ryan D. Dreveskracht

Ryan D. Dreveskracht, WSBA #42593
s/Gabriel S. Galanda

Gabriel S. Galanda, WSBA #30331
Attorneys for Plaintiffs
P.O. Box 15146 Seattle, WA 98115
(206) 557-7509 Fax: (206) 299-7690
Email: ryan@galandabroadman.com
Email: gabe@galandabroadman.com

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1

## CERTIFICATE OF SERVICE

2      I, Wendy Foster, declare as follows:

3      1.      I am now and at all times herein mentioned a legal and permanent resident of the

4   United States and the State of Washington, over the age of eighteen years, not a party to the above-

5   entitled action, and competent to testify as a witness.

6      2.      I am employed with the law firm of Galanda Broadman PLLC, 8606 35th Avenue

7   NE, Ste. L1, Seattle, WA 98115.

8      3.      Today I served the foregoing document, via this Court's ECF system, on all

9   Defendants.

10      The foregoing Statement is made under penalty of perjury and under the laws of the State

11   of Washington and is true and correct.

12      Signed at Seattle, Washington, this 27th day of January, 2021.

13

14                                              s/Wendy Foster
                                                Wendy Foster

15

16

17

18

19

20

21

22

23

24

25

FIRST AMENDED COMPLAINT - 25

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509