1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| CARRIE A. ANDERSON, in her Personal Capacity and as Personal Representative of the ESTATE OF KIRK DANIEL POWLESS, deceased; *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WHATCOM COUNTY, a political subdivision of the State of Washington; *et al.*,<br><br>Defendants. | NO.   2:20-cv-01125-TSZ<br><br>**PLAINTIFFS' MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>NOTE ON MOTION CALENDAR:<br>October 8, 2021 |

## I.   INTRODUCTION

"Rule 11 demands a lawyer have a good faith basis that there is evidentiary support for every assertion in a pleading.  That requirement applies to affirmative defenses just like other assertions in a pleading." *Greenspan v. Platinum Healthcare Grp.*, No. 20-5874, 2021 WL 978899, at *1 (E.D. Pa. Mar. 16, 2021); *see also Ruth v. Unifund CCR Partners*, 604 F.3d 908, 911 (6th Cir. 2010) (same).  Parties may not assert affirmative defenses just to preserve them; "[t]he assertion of prophylactic affirmative defenses is not harmless." *Greenspan*, 2021 WL 978899, at 3.

Plaintiffs move for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(h)(2) because several of Defendants' affirmative defenses: (1) are not affirmative defenses, or (2) do not meet the requisite pleading standard.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

## II.    FACTS

**A.  PREVIOUS INCARCERATIONS**

The Whatcom County Jail ("Jail") was well aware of Kirk Powless' previous suicide attempts, self-harm, and mental health and addiction issues.[1]  In 2008, for instance, Kirk "was yelling and telling [another inmate], hit me, hit me in the face."[2]  Once the inmate obliged, Kirk "kept telling [the other inmate] to hit him again."[3]  This continued until Kirk was "hit in the face five to six times" and "lost consciousness."[4]  When Kirk was found by jailers with "blood all over his nose, mouth, and a towel," he was interviewed and "just shook his head and said . . . 'I'm crazy, I have mental issues.'"[5]  He was diagnosed by a Jail psychiatrist with schizophrenia and prescribed Seroquel—he was hearing "voices" that told him "to do something dramatic."[6]  Jail medical records note: "**Mental health issue: He invites self harm**."[7]

In November of 2013 Kirk was hospitalized at PeaceHealth St. Joseph Medical Center ("St. Joseph's") for attempting suicide.[8]  Kirk disclosed this to Jail medical provider Heidi Zoesl in October of 2014, where her chart notes indicate that "he suffered from severe depression with impulsive drug induced suicidality" and that "he had attempted suicide about 6 times over the past year."[9]  He also had noticeable and obvious suicide-attempt scars on both of his forearms.[10]  This

---

[1] Kirk had been booked into the Jail 14 times, beginning with his first booking in December of 2002.  Declaration of Ryan D. Dreveskracht ("Dreveskracht Decl."), Exhibit 6, at 1.
[2] Dreveskracht Decl., Exhibit 7, at 2.
[3] *Id.*
[4] *Id.*
[5] *Id.*, at 2-3.  This resulted in medical records being sent to the Jail and reviewed by Dr. Stewart Andrews on December 9, 2008.  Dreveskracht Decl., Exhibit 8.  Included in these medical records was information on Kirk's "1 year history of heavy heroin use" and desire to safely detox.  *Id.*, at 1.
[6] Dreveskracht Decl., Exhibits 9-10.  "Seroquel is an antipsychotic medicine used to treat schizophrenia and bipolar disorder; it is sometimes used together with antidepressant medications to treat major depressive disorder in adults."  *Farmer v. MHM Maryland, Inc.*, No. 14-3080, 2015 WL 4069529, at *4 (D. Md. July 2, 2015) (quotation omitted).
[7] Dreveskracht Decl., Exhibit 11 (emphasis added); *see also* Dreveskracht Decl., Exhibit 12 (referral to Jail mental health noting "PTSD, manic depression, bipolar").
[8] Dreveskracht Decl., Exhibit 6, at 2.
[9] *Id.*; Dreveskracht Decl., Exhibits 14, 15, & 114 at 29 (deposition transcript pages referenced as originally paginated).  These six suicide attempts should have been listed on Kirk's Problem List but were not.  *See* Dreveskracht Decl., Exhibit 16, at 46 ("Q. . . . [T]hat Mr. Powless at least self-reports that, in 2014, he had six attempts in the past year, should this have been on his Problem List?  A. . . . Yes."); *id.* at 50-51 (same).
[10] Dreveskracht Decl., Exhibit 17, at 2.

PLAINTIFFS' MOTION FOR
JUDGMENT ON THE PLEADINGS - 2

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

triggered the County to obtain medical records from Kirk's outside providers—which were reviewed by Dr. Andrews on October 14, 2014, and included information on and notice of his diagnoses of posttraumatic stress disorder ("PTSD"), severe depressive disorder, heroin addiction, anxiety, hepatitis C, insomnia, and bipolar disorder.[11]

Jail and medical staff also knew of Kirk's "history with poly substance abuse."[12]  As early as 2008, Kirk notified Jail and medical staff that he was "withdrawing from heroin."[13]  On June 8, 2008, Kirk wrote in a medical request: "I'm addicted 2 heroin. Need help detoxin please."[14]  Kirk's intake screenings indicate that he informed Jail and medical staff consistently that he would be withdrawing from opiates each and every succeeding incarceration.[15]

## B.    KIRK'S FINAL INCARCERATION

Kirk was arrested on May 31, 2018, on probable cause for an identity theft investigation.[16] Incident to arrest, the arresting officer found heroin in Kirk's pocket and Kirk "admitted that he is a heroin user."[17]

Kirk was transported to the Jail, where it was determined that because of an injury to his wrist and an "abscess in his buttocks" that caused him to have "limited balance," Kirk needed to be taken to St. Joseph's for a "fit for jail."[18]  Kirk's injuries were evaluated and he was discharged "with paperwork to give to the Jail."[19]  Included in this paperwork were medical records[20]

---

[11] Dreveskracht Decl., Exhibit 18.
[12] Dreveskracht Decl., Exhibit 19, at 2; *see also* Dreveskracht Decl., Exhibit 20, at 8 (note of "admitted heroin use").
[13] Dreveskracht Decl., Exhibit 21.
[14] Dreveskracht Decl., Exhibit 22.
[15] *See, e.g.,* Dreveskracht Decl., Exhibit 23, at 5 ("Do you use street drugs? . . . Yes. HERION [sic] 45 MINS AGO); *id.* at 8 ("Do you use street drugs? . . . Yes. Heorin [sic] and meth. Uses both 3 to 4 times a day. Last used prior to booking, normal dose."); *id.* at 10 ("Do you use street drugs? . . . Yes heroin, last used 36 hours ago); *id.* at 14 ("Do you use street drugs? . . . Yes HEROIN—USED LAST NIGHT"); Dreveskracht Decl., Exhibit 24 (referral to Jail mental health, noting reason as "PTSD, manic depression, bipolar, high utilizer [of] IV heroin + withdrawal, hepatitis").
[16] Dreveskracht Decl., Exhibit 25.
[17] *Id.*
[18] Dreveskracht Decl., Exhibit 26, at 3.
[19] *Id.*
[20] The County's written Hospital & Specialty Care policy requires that the St. Joseph's Emergency Department provide a copy of any relevant medical records to the Jail upon discharge.  Dreveskracht Decl., Exhibit 28.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

indicating that Kirk had previously presented to the St. Joseph's Emergency Room with "suicidal ideation."[21]  Specifically, the records indicated that Kirk had "overdos[ed] on 30 over the counter sleeping pills and 16 xanax . . . in an attempt to end his life" and that prior to that, Kirk attempted suicide by hanging, but ingested heroin and "fell asleep prior to completing his suicide plan."[22]  The records also indicated that Kirk's stated reason for his previous suicide attempts were related to "fears about detoxing from heroin without medication that would help to calm his extreme anxiety."[23]

Medical screening—which generally consisted of "call[ing] all patients on the phone [and] ask[ing] them if they have any medical concerns"[24]—was conducted by Nurse Kyle Pritchard.[25] Kirk denied previous suicide attempts or ideation, and indicated at intake the following:[26]

**21. Do you have Hepatitis?**
Yes
hep c

**22. Have you ever had a positive TB skin test?.**
No

**23. Do you use street drugs: Note the type and amount**
Yes
heroin last used a few hours ago about 1 gram a day

**7. Is this person obviously injured?**
Yes
Injury to right hand

**8. Are you under a doctor's care?**
Yes
absess on left butt cheek

**10..Are you in pain?**
Yes
right hand

**11. Are you currently bleeding?**
Yes
absess on buttocks

Prior to calling Kirk, Nurse Pritchard reviewed the medical records sent from St. Joseph's and Kirk's medical chart, which included—in addition to serious mental health diagnoses and previous suicide attempts[27]—the following Problem List, contraindicating the answers given at intake:[28]

---

[21] Dreveskracht Decl., Exhibit 29, at 1.
[22] *Id.*
[23] *Id.*
[24] Dreveskracht Decl., Exhibit 30, at 3; *see also* Declaration of Marcus Mosley ("Mosley Decl."), ¶9 ("It is the established practice at the Jail that . . . [t]he medical provider will ask a number of medical and mental health-related questions over the 'Batphone,' within earshot of other inmates, and the incentive to answer 'yes' or to obtain an accurate picture of the inmate's condition is . . . diminutive.")
[25] Dreveskracht Decl., Exhibit 30.  Deputy Chris Freeman completed the medical intake that was reviewed by Defendant Pritchard.  Dreveskracht Decl., Exhibit 31, at 4.  It is the established practice at the Jail that medical intake questions are "not asked by someone who is health trained."  Dreveskracht Decl., Exhibit 32, at 11.
[26] Dreveskracht Decl., Exhibit 23, at 1-3.
[27] Dreveskracht Decl., Exhibit 112, at 11-12, 16, 17-18.  Per the County's established practice, intake forms are reviewed by nursing staff, not a supervising physician.  Dreveskracht Decl., Exhibit 16, at 29.  Nursing staff serves a gatekeeping function to physician access.  *Id.*, at 32 ("Q.  And the determination on which patients you do see is made by nursing staff, correct?  A.  Yes.").
[28] Dreveskracht Decl., Exhibit 34; *see also id.* (listing as chronic problems "Hep C," "opioid dependance," "heroin addiction," "polysubstance abuse incl. meth, heroin, cocaine," "ADD," "PTSD," "depressive di[sorder] severe,"

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

WC00142

| Active and Chronic Disease Problem List | | | T[oradol] – GI upset | |
|---|---|---|---|---|
| Hepatitis C (per pt) | | | | |
| Poly substance abuse (opioids, heroin, meth, heroin, cocaine) | | | | |
| PTSD, ADHD, anxiety | | | | |
| Asthma | | | | |
| Elevated BP | | Surgeries/Procedures | | Date |
| Poor Vision | | Cystoscopy w/ ureters stent | | 8-9-17 |
| GERD | | | | |
| dentures | | | | |
| Bipolar | | | | |
| Urinary Retention | | ALERTS: | | |
| SI 11/13 → ODE | OC meds & xango | | | |

Because neither the deputy that completed Kirk's intake nor Nurse Pritchard (over the phone) were permitted to observe Kirk's "arms for things like legions, scars or other indications of suicide attempts, or needle marks [and] indications of drug abuse,"[29] neither noted the scars on both of his forearms that contraindicated his answers.[30]   Although per Jail policy Nurse Pritchett had an obligation to house Kirk—an inmate known to be at "a high risk of suicide"—on the first floor medical unit for closer observation until he could be evaluated by a medical and mental health provider, he chose not to because Kirk "refused to speak to [him] on the phone."[31]

WC01086

Though Kirk was injured, had been diagnosed with Hepatitis C, was a daily heroin user, and had just ingested heroin an hour earlier[32] he was not classified as a "special needs inmate" as required by the County's Classification Policy.[33]   At roughly 8:30 p.m. Kirk was housed alone in cell A-4 of the 2A module, which at the time served as "general purpose housing"[34]—in violation of the County's written policy that "[i]nmates who are going through alcohol or drug withdrawal

---

"bipolar disorder," and "anxiety").  In medical charts, the abbreviation "SI" indicates "Suicidal Ideation."  Dreveskracht Decl., Exhibit 16, at 50, 87.

[29] Dreveskracht Decl., Exhibit 32, at 12.

[30] Dreveskracht Decl., Exhibit 17, at 2.

[31] Dreveskracht Decl., Exhibit 113, at 28-37, 52.  This was the County's established practice.  *See id.*, at 38-39 ("Q. . . . [I]t's the established practice there in the jail to not move an inmate down to the first floor until they've been assessed, even if there was, again, red flags in the medical records such as previous suicide attempts, serious mental illness, and opiate withdrawal; is that correct? . . . A. That's correct.")

[32] Kirk's previous intake screenings indicate likewise.  *See, e.g.* Dreveskracht Decl., Exhibit 23, at 5, 8, 10, 14.

[33] Dreveskracht Decl., Exhibit 35.  "Whatcom County Jail does not have an infirmary.  Patients under medical observation are housed on the first floor."  Dreveskracht Decl., Exhibit 36.  Classification assessment was completed by Deputy Rick Reid (classification deputy) at 8:17 am on June 4, 2018.  Dreveskracht Decl., Exhibit 37.

[34] Dreveskracht Decl., Exhibits 5, 37, & 38.

PLAINTIFFS' MOTION FOR
JUDGMENT ON THE PLEADINGS - 5

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

or who are suicidal . . . are housed separately and monitored closely on first floor"[35] and that "[i]nmates who have a history of recent suicidal ideation are examined by a mental health liaison and cleared before release to the general population."[36]  As one inmate who is "familiar with [the Jail's] policies and established practices"[37] has testified:

> While the Jail's official policy is that inmates who are going through withdrawal must be housed on the first floor and monitored closely,[38] this is not borne out in practice because the first floor is more often than not full or being used for what the Jail deems more high-priority medical needs. The Jail simply does not have the space to adequately treat inmates withdrawing from opioids on the first floor; yet it refuses to modify its policy so that these inmates can receive the care that they need in other housing areas. I have personally observed this practice on numerous occasions.[39]

This was also in violation of the County's written policy on Suicide in the Jail Setting, which identified Kirk at a "HIGH risk of suicide":

> Inmates are asked about their suicidal history and ideation when they are booked into jail. This occurs each and every time. Any past history of suicide attempts, even as a juvenile is carried forward and special attention is placed on this. It triggers an automatic referral to mental health, regardless if the inmate states if they want it or not. . . . Inmates are at HIGH risk of suicide if: . . .
>
> • They have drug and alcohol issues, **especially heroin withdrawal** . . .
>
> • There is a history of previous attempts . . .
>
> • They are mentally ill[40]

On June 1, 2018, the following referral was made to the Jail's mental health clinician, Heidi Zosel, pursuant to the County's written policy that "triggers an automatic referral to mental health"

---

[35] Dreveskracht Decl., Exhibit 40; *see also* Dreveskracht Decl., Exhibit 41 ("Patients being monitored for alcohol and other drug problems are housed on the first floor until the withdrawal protocol is completed."); *cf.* Dreveskracht Decl., Exhibit 42, at 70-71 ("Q. . . . [M]r. Powless was likely detoxing from heroin, correct? . . .  A.  I would anticipate if Kirk had in fact taken the heroin he reported he did, he would probably be going through some type of withdrawal symptoms, yes.  Q.  And he wasn't put on the first floor or treated medically, correct?  A.  That's correct.").  The first floor is a "direct supervision unit." *Id.*, at 23.

[36] Dreveskracht Decl., Exhibit 43.

[37] Mosley Decl., ¶2.

[38] *See* Dreveskracht Decl., Exhibit 116, at 40 ("Q. And what kind of people get housed [on the first floor]?  A. People in there would be typically anybody on watch for medical withdrawals . . . .").

[39] Mosley Decl., ¶6.

[40] Dreveskracht Decl., Exhibit 44 (emphasis added).

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

for a suicide risk assessment for any inmate that "has any past history of suicide attempts":[41]



On June 2, 2018, the records from St. Joseph's—which, as discussed above, included specific information regarding Kirk's onset of suicidality due to non-medicated detox—were reviewed by Dr. Andrews.[43]  Dr. Andrews did nothing in response.[44]

On June 3, 2018, Ms. Zosel responded to the June 1 referral by *calling* Kirk to conduct a suicide risk assessment *over the in-unit phone*,[45] which is the typical "way contact is made with an inmate for medical or mental health care . . . if they're housed in general population areas."[46]  Not interested in the probing telephone conversation within earshot of his fellow inmates,[47] Kirk hung up the phone after a couple of seconds, as he had in the past.[48]  While Ms. Zosel had the ability to move Kirk to the first floor—or to attempt a suicide risk assessment based on known risk factors (as she had done in the past)—she "made the clinical decision not to."[49]  As a result, <u>Kirk was not seen in person by a medical or mental health provider his entire final incarceration, and Kirk's</u>

---

[41] Dreveskracht Decl., Exhibit 114, at 66-67.

[42] Dreveskracht Decl., Exhibit 46.

[43] Dreveskracht Decl., Exhibit 29.

[44] Dreveskracht Decl., Exhibit 51.  At a minimum, Dr. Andrews had an obligation to advise correctional staff of Kirk's serious mental illness and history of suicide attempts per the Jail's written policy on "communication o[f] patients' health needs."  Dreveskracht Decl., Exhibit 47; *see also* Dreveskracht Decl., Exhibit 41 ("Patients being monitored for alcohol and other drug problems are housed on the first floor until the withdrawal protocol is completed.").  Dr. Andrews' hesitation to provide additional care at this critical juncture may have been due to "concerns," voiced to him a few years earlier, "about escalating costs of medications" caused by "starting patients on multiple psychiatric medications at once."  Dreveskracht Decl., Exhibit 50.

[45] Dreveskracht Decl., Exhibit 52; Dreveskracht Decl., Exhibit 31 at 4.

[46] Dreveskracht Decl., Exhibit 42, at 53-54.  Inmates "housed on the first floor," though, are "seen by one of the nurses." *Id.* at 54.

[47] This is also in violation of the County's written Privacy of Care policy.  Dreveskracht Decl., Exhibit 53.  It was not until late-2019 that utilizing a waiting room was converted into a room for "mental health interviews," in order to "increase privacy for mental health conversations and maintain the safety of the mental health professionals."  Dreveskracht Decl., Exhibit 42, at 55.

[48] Dreveskracht Decl., Exhibit 52.

[49] Dreveskracht Decl., Exhibit 114, at 53-54; Dreveskracht Decl., Exhibit 42, at 82.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1  suicide risk was never assessed.[50]  Unfortunately, this was par for the course at the Jail.  As

2  described by one inmate housed with Kirk:

> During Kirk's entire incarceration in the Jail, he was quite obviously going through extreme opiate withdrawals. This was known to all of the inmates housed with Kirk and all of the jailers that interacted with him. Because it was obvious. He was not eating. He slept on a mat on the floor, next to the toilet, because he was constantly nauseous and cold sweating. His entire incarceration I observed Kirk come out of his room only once, on June 3, and he looked to be in pain and was gaunt. He was pale, sweaty, and shaking. . . . If any medical professional saw the condition that Kirk was in, they would have immediately provided assistance. That he needed medical assistance for his withdrawal was obvious even to me. But it was the established practice at the Jail for inmates to be provided medical and mental healthcare over the unit telephone—referred to by inmates and jailers as "the Batphone"—not in person. The established practice is that when an inmate puts in a medical or mental health kite, a medical or mental health provider will respond by calling the unit "Batphone." An inmate will answer, and the person in need of care will be beckoned to the "Batphone," which is featured prominently in the unit and allows for absolutely no semblance of privacy.  More often than not—due to the fact that the inmate is then forced to discuss serious medical or mental health issues in front of his peers—these calls are declined, and the inmate receives no in-person care.[51]

13  On June 4, 2018, Deputy Violet Ignashova—who had no suicide prevention training[52]—

14  "was assigned to work second floor as a primary deputy."[53]  The second floor "houses the majority

15  of the offenders" and is essentially a long corridor with tanks 2A thru 2F, "which have a total of

16  128 bunks."[54]  As the only second floor deputies on day shift,[55] Deputy Ignashova and Deputy

17  Bryan Beaulieu—but primarily Deputy Ignashova[56]—were responsible for all of the security

18  checks on the entire floor.[57]  Deputy Ignashova conducted a head count at 6:54 a.m.[58]  This is the

19  last time Kirk would be seen alive.

---

[50] Dreveskracht Decl., Exhibit 113, at 23.  This was in violation of the Jail's written policy, which required that Kirk be "seen by nursing upon return from [an] emergency department visit."  Dreveskracht Decl., Exhibit 55.
[51] Mosley Decl., ¶¶4, 8.
[52] Dreveskracht Decl., Exhibit 56; Dreveskracht Decl., Exhibit 57, at 7.
[53] Dreveskracht Decl., Exhibit 58, at 4.
[54] Dreveskracht Decl., Exhibit 59.
[55] Dreveskracht Decl., Exhibit 60.
[56] Dreveskracht Decl., Exhibit 32, at 20-21.
[57] Dreveskracht Decl., Exhibit 62.
[58] Dreveskracht Decl., Exhibit 81, at 6:54.

PLAINTIFFS' MOTION FOR
JUDGMENT ON THE PLEADINGS - 8

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

At roughly 8:00 a.m., Deputy Ignashova "intercomed [Kirk] via speaker, and asked him if he wanted to take his medications, to which [he responded], 'I don't take any medication, I don't want any medication.'"[59]  Over two hours later, at 10:05 a.m.,[60] Kirk "tied a knot in the distal portion of the shirt and placed his head in both the neck area and a sleeve resulting in vertical orientation with feet on the ground.  After closing the door with the knotted shirt over the top, the ligature was utilized."[61]  Kirk, and the white t-shirt that he was hanging from, were not visible from outside of tank 2A, through the window of the tank and the window in his door.[62]  Because Deputy Ignashova did not conduct another direct-view safety check during her entire shift, Kirk was not discovered until shortly after 11:00 a.m.[63]  This was the established practice at the Jail:

> "Cell checks" at the Jail are nonexistent. The jailers do not ever enter the unit or look into the cells. At times, jailers walk by the unit and peer through the window, where they can see some of the open area. But much of the unit, including numerous cells, are obstructed and cannot be observed by peering through the window into the unit. . . . On June 4, 2018, I was in the Unit with Kirk the entire day. . . . [N]ot a single jailer, medical provider, mental health provider—nobody—entered the unit, conducted any "cell check," or made any effort to ensure the safety and security of the inmates in our unit.[64]

At 11:04 a.m., an inmate walking by Kirk's cell discovered him hanging by looking into the window on his cell door.[65]  The inmate then ran over to the window the tank, where he immediately notified Deputy Ignashova—whose response was shockingly nonchalant.  According to the inmate who discovered Kirk:

> I noticed that there was a white knot sticking out of Kirk's door and that he was hanging from the other end. I ran to the door, which was locked, and started banging on it and got no response from Kirk. I then ran to the window that was at the entrance of the unit and tried to get the jailer—Violet Ignashova's—attention. She was sitting at a desk and couldn't be bothered. I was yelling through the hatch: "This dude hung himself." Ms. Ignashova didn't immediately respond. She acted

[59] Dreveskracht Decl., Exhibit 63, at 2, 4.
[60] Dreveskracht Decl., Exhibit 5, at 1.
[61] Dreveskracht Decl., Exhibit 64, at 3.
[62] Dreveskracht Decl., Exhibit 32, at 34.
[63] Video surveillance shows that **from 6:54 a.m. until he was found dead at 11:07 a.m., not a single Jail employee or contractor looked into Kirk's cell**.  Dreveskracht Decl., Exhibits 80-81.
[64] Mosley Decl., ¶¶7, 10.
[65] Dreveskracht Decl., Exhibit 5, at 2.

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1   as though she thought it was a joke. She took her time to get to the door, then just
2   stood there for what felt like forever. I told Ms. Ignashova: "Pop the door! Pop four
    house! This dude hung himself."[66]

3        Meanwhile, other inmates immediately tried to rescue Kirk, but the door to his cell had

4   locked when he shut the sheet in the door.  Deputy Ignashova at this point chose to make the inmates

5   go into their cells and "lock down."  As described by one inmate:

6        [W]e're tryin' to get her to pop the four house, and my buddy, FROST, was standin'
         at the door, tryin' to untie the knot on the door, and he's tellin' 'er, "Pop four house.
7        Pop the door. Pop the door.," you know, and she just was tellin' everybody to,
         "Lock down. Lock down." We kept tellin' 'er, "Unlock, just unlock the fuckin'
8        door."[67]

9   Once Deputy Ignashova finally got to Jail Control, where Kirk's door could be unlocked, the door

10  would not open.  As Deputy Ignashova put it: "I went to the panel, . . . started popping the door,

11  but it was kind of jammed."[68]  After fumbling with the door for some time, three fellow inmates

12  freed Kirk and lowered him to the floor.[69]  Deputy Ignashova would not let the inmates render aid

13  to Kirk, however.  Instead, per Jail policy, she instructed them to "lock down" by retreating into

14  their individual cells and locking the door behind them. [70]  Deputy Ignashova then waited outside

15  of the tank[71]—per Jail policy "Jail Staff is not to enter the cell block alone."[72]

16        At 11:07 a.m.[73]—over three minutes since Deputy Ignashova was notified that Kirk was

17  hanging[74]—Deputy Ignashova "finally *walked* into the unit,"[75] where Kirk sat "hunched over with

18

---

19  [66] Mosley Decl., ¶11; *see also* Dreveskracht Decl., Exhibit 65 (same).
20  [67] Dreveskracht Decl., Exhibit 65; *see also* Dreveskracht Decl., Exhibit 32, at 31 ("[Ms. Ignashova] was outside of the
    unit, screaming through the food hatch to have the inmates in 2 Adam to lock down.").
21  [68] Dreveskracht Decl., Exhibit 63; *see also* Dreveskracht Decl., Exhibit 66, at 1 ("[O]fficer stated that the door appeared
    stuck . . . ."); Dreveskracht Decl., Exhibit 69, at 1 (noting that "the door to 2A04 . . . apparently was jammed shut").
    [69] Dreveskracht Decl., Exhibit 38, at 3; Dreveskracht Decl., Exhibit 63, at 8.
22  [70] Dreveskracht Decl., Exhibit 38, at 3; Mosley Decl., ¶11.
    [71] *See* Dreveskracht Decl., Exhibit 67, at 3 ("When I arrived at 2A, Deputy Ignashova was yelling for the other inmates
    in 2A to lock down.  Once the inmates were locked down we entered 2A . . . .").
23  [72] Dreveskracht Decl., Exhibit 38, at 3.
    [73] Dreveskracht Decl., Exhibit 68, at 6.
24  [74] Because "a suicide attempt by hanging can take just three minutes to result in permanent brain damage," these three
    precious minutes were crucial.  WORLD HEALTH ORGANIZATION, PREVENTING SUICIDE IN JAILS AND PRISONS 14
    (2007).
25  [75] Mosley Decl., ¶11 (emphasis in original).

PLAINTIFFS' MOTION FOR
JUDGMENT ON THE PLEADINGS - 10

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1 a bed sheet tied around his neck."[76]  Roughly one minute later, Deputy Ignashova began chest

2 compressions, which were unsuccessful.[77]  "His skin was blue in color" and "his lips [were] sunken

3 in around his teeth."[78]  Kirk was pronounced dead at 11:32 a.m.[79]

4    An autopsy was conducted on June 5, 2018.[80]  The cause of death was determined to be

5 "[a]sphyxia by ligature hanging" with "illicit substance usage" as a contributory factor.[81]  "Aspects

6 of the brain indicated abnormal (low) dopamine levels" demonstrating that Kirk was experiencing

7 severe withdrawal.[82]

8    ### III.    LAW AND ARGUMENT

9 **A.    STANDARD**

10    Plaintiffs' motion pertains to an "objection of failure to state a legal defense to a claim,"

11 which may be made "in any pleading permitted or ordered under Rule 7(a), or by motion for

12 judgment on the pleadings, or at a trial on the merits."  Fed. R. Civ. P. 12(h)(2); *see, e.g., Mag*

13 *Instrument v. JS Prod.*, 595 F. Supp. 2d 1102 (C.D. Cal. 2008).  In deciding such a motion, "[t]he

14 court must assume the truthfulness of all material facts alleged and construe all inferences

15 reasonably to be drawn from the facts in favor of the responding party."  *Mag Instrument,* 595 F.

16 Supp. 2d at 1106-07.  "[J]udgment on the pleadings, much like summary judgment, 'shall be

17 rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file,

18 together with the affidavits, if any, show that there is no genuine issue as to any material fact and

19 that the moving party is entitled to a judgment as a matter of law.'"  *United States v. Jackson*, No.

20 05-0214, 2007 WL 1169695, at *2 (D. Idaho Apr. 19, 2007) (quoting Fed. R. Civ. P. 56(c)).

---

[76] Dreveskracht Decl., Exhibit 69, at 4.
[77] Dreveskracht Decl., Exhibit 68, at 6.
[78] *Id.*, at 13.
[79] Dreveskracht Decl., Exhibit 66, at 1.
[80] Dreveskracht Decl., Exhibit 64, at 1.
[81] *Id.*, at 2; Dkt. # 55.
[82] Dreveskracht Decl., Exhibit 17, at 2.

PLAINTIFFS' MOTION FOR
JUDGMENT ON THE PLEADINGS - 11

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1

2

**B.    THE COUNTY DEFENDANTS' SECOND, THIRD, FOURTH, FIFTH, SIXTH, AND SEVENTH AFFIRMATIVE DEFENSES SHOULD BE DISMISSED.[83]**

3

**1.    The County Defendants' Second Affirmative Defense Should Be Dismissed.**

4

The County Defendants assert "[t]hat the public duty doctrine and qualified and/or good

5

faith immunity preclude plaintiffs' state law claims."[84]   First, Plaintiffs are unaware of any

6

applicable statute or common law doctrine granting corrections officials with "good faith

7

immunity."  *Cf.* RCW 26.44.060(1); RCW 68.50.620(3); RCW 9.41.0975.  Second, the "public

8

duty doctrine" applies only when a plaintiff asserts "an abstract duty to the nebulous public" as

9

opposed to "a specific duty enforceable . . . in tort."  *Mancini v. City of Tacoma*, 479 P.3d 656, 668

10

(Wash. 2021) (citing *Beltran-Serrano v. City of Tacoma*, 442 P.3d 608 (Wash. 2019)); *see also*

11

*Norg v. City of Seattle*, 491 P.3d 237, 245 (Wash. Ct. App. 2021).  Here, Plaintiffs claim that the

12

County Defendants breached the well-established "duty owed to keep a prisoner safe," which

13

"arises out of the special relationship in which the defendant voluntarily takes custody of another

14

under circumstances such as to deprive the other of his normal opportunities for protection."

15

*Lockrem v. United States*, No. 10-0871, 2011 WL 3501693, at *5 (W.D. Wash. Aug. 10, 2011)

16

(quotation omitted).  As the Washington State Supreme Court explained in *Gregoire v. City of Oak*

17

*Harbor*:

18

> [A] county jail owes the direct duty to a prisoner in his custody to keep him in
> health and free from harm, and for any breach of such duty resulting in injury he is
> liable to the prisoner or, if he be dead, to those entitled to recover for his wrongful
> death.  The duty owed is a positive duty arising out of the special relationship that
> results when a custodian has complete control over a prisoner deprived of liberty. .
> . . [T]his duty of providing for the health of a prisoner is nondelegable.

19

20

21

22

23

24

25

---

[83] Except for the individually named County Defendants' federal qualified immunity defense, "state-law defenses have no bearing on liability under 42 U.S.C. § 1983" and do not apply Plaintiffs' 42 U.S.C. § 1983 claims. *Waugh v. Dow*, No. 11-1419, 2014 WL 2807574, at *24 (W.D. Okla. June 20, 2014), *aff'd*, 617 F. App'x 867 (10th Cir. 2015); *see also Meagher v. King Cty.*, No. C19-0259, 2020 WL 3872744, at *14 (W.D. Wash. July 9, 2020) (same).  Thus, Plaintiffs presume that these defenses are only being asserted against Plaintiffs' state law claims.
[84] Dkt. # 50, at 14.

PLAINTIFFS' MOTION FOR
JUDGMENT ON THE PLEADINGS - 12

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

244 P.3d 924, 927-28 (Wash. 2010); *see also Turner v. Washington State Dep't of Soc. & Health Servs.*, No. 99243-6, 2021 WL 3557309, at \*5 (Wash. Aug. 12, 2021) ("If a special relationship is formed, it has an accompanying duty of care to protect the plaintiff from foreseeable harm, which borders on strict liability.") (quotation omitted).  The "public duty doctrine" simply does not apply here.  County Defendants owed Kirk a specific duty.  This affirmative defense should be dismissed.

### 2.    The County Defendants' Third Affirmative Defense Should Be Dismissed.

The County Defendants assert that "plaintiffs have failed to state claim upon which relief can be granted."[85]  An attack on a plaintiff's case in chief is not an affirmative defense.  *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002).  Thus, "failure to state a claim is not an affirmative defense; it is a defect in a plaintiff's claim and not an additional set of facts that would bar recovery notwithstanding the plaintiff's valid *prima facie* case." *Vogel v. Huntington Oaks Delaware Partners, LLC*, 291 F.R.D. 438, 442 (C.D. Cal. 2013); *see also Barnes v. AT&T Pension Ben. Plan*, 718 F. Supp. 2d 1167, 1174 (N.D. Cal. 2010) ("Failure to state a claim is not a proper affirmative defense . . . .").  This affirmative defense should be dismissed.

### 3.    The County Defendants' Fourth Affirmative Defense Should Be Dismissed.

The County Defendants assert "[t]hat the plaintiffs' comparative fault proximately caused their damages, if any."[86]  This affirmative defense is contrary to well-established Washington State law and is easily disposed of by *Gregoire*'s holding that a jail's "duty to protect inmates includes protection from self-inflicted harm and, in that light, **contributory negligence has no place in such a scheme**."  244 P.3d 924, 931 (Wash. 2010) (emphasis added); *see also Meagher*, 2020 WL 3872744, at \*14 (holding that *Gregoire* "disposes of this issue").  Citing *Gregoire*, numerous courts have held that it would be an "error to instruct jury on contributory negligence when jailor had a duty to protect inmate from that harm."  *Ammons v. Washington, Dep't of Soc. & Health Servs.*,

---

[85] Dkt. # 50, at 14.
[86] Dkt. # 50, at 14.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

No. 08-5548, 2013 WL 139541, at *4 (W.D. Wash. Jan. 10, 2013); *see also Dahl v. Mason Cty.*, No. 16-5719, 2018 WL 501631, at *1 (W.D. Wash. Jan. 22, 2018); *Hendrickson v. Moses Lake Sch. Dist.*, 398 P.3d 1199, 1204 (Wash. Ct. App. 2017).  As the Seventh Circuit Court of Appeals held in *Myers v. City of Lake*, "[i]f the custodian has a duty to protect the inmate from himself, the fact that the inmate tried to harm himself is *a reason for liability* rather than a defense."  30 F.3d 847, 852 (7th Cir. 1994) (emphasis added).  This affirmative defense should be dismissed.

> **4.      The County Defendants' Fifth and Sixth Affirmative Defenses Should Be Dismissed.**

The County Defendants submit that "plaintiffs failed to mitigate their damages, if any" and "[t]hat the plaintiffs' damages, if any, were caused by fault of parties not in the control of Whatcom County Defendants or non-parties not in the control of Whatcom County Defendants."[87]  But as discussed above, Kirk's "special relationship" with the County rendered its duty to Kirk "nondelegable."  *Gregoire*, 244 P.3d at 928; *see also Turner*, 2021 WL 3557309, at *5 ("**If a special relationship is formed, it has an accompanying duty of care to protect the plaintiff from foreseeable harm, which borders on strict liability.**") (quotation omitted, emphasis added); *Shea v. City of Spokane*, 562 P.2d 264, 268 (Wash. App. 1977), *aff'd*, 578 P.2d 42 (1978) ("[T]he City's liability includes the negligence of the jail physician because the duty to keep the prisoner in health is nondelegable."); *Wilson v. Pierce Cty.*, No. 16-5455, 2016 WL 4376784, at *6 (W.D. Wash. Aug. 17, 2016) (same).  Kirk had no duty to mitigate anything because his custody removed "his normal opportunities for protection." *Lockrem*, 2011 WL 3501693, at *5 (quotation omitted).  To the extent that the County Defendants let another party provide negligent care while Kirk was in their custody, that is a reason for liability, not a defense to it.  *Baker v. State, Dep't of Corr.*, 123 Wash. App. 1038 (2004) (citing *Kusah v. McCorkle*, 170 P. 1023, 1026 (Wash. 1918)).  This affirmative defense should be dismissed.

---

[87] Dkt. # 50, at 14.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1

### 5.      The County Defendants' Seventh Affirmative Defense Should Be Dismissed.

2        The County Defendants assert "[t]hat discretionary immunity precludes plaintiffs'

3   claims."[88]   In Washington State, courts construe the doctrine of discretionary immunity narrowly

4   and only apply it to "basic policy decisions."  *Taggart v. State*, 822 P.2d 243, 253 (Wash. 1992);

5   *Mancini*, 479 P.3d at 667; *see also Evans v. Spokane Cty.*, No. 36495-0-III, 2020 WL 6500743, at

6   *19 (Wash. App. 2020) (holding that discretionary immunity applies only to "a high-level

7   discretionary act exercised at a truly executive level"); *Howell v. Dep't of Soc. & Health Servs.*, 436

8   P.3d 368, 379 (Wash. App. 2019) ("[A]gency decisions will not enjoy discretionary immunity if

9   the required conscious balancing of risks and advantages did not take place.").  Here, Plaintiffs do

10  assert that Whatcom County was negligent when, for instance, it implemented a "policy and

11  practice to deny medically appropriate treatment to heroin users," maintained "a policy and

12  established practice of providing healthcare and mental healthcare over the phone," and set into

13  place "a known policy and custom of understaffing [and] overcrowding."[89]   But these types of

14  policies are of the "operational or ministerial" variety that are clearly not subject to discretionary

15  immunity.  *Preston v. Boyer*, No. 16-1106, 2019 WL 8060201, at *6 (W.D. Wash. Nov. 27, 2019);

16  *see also Greensun Grp., LLC v. City of Bellevue*, 436 P.3d 397, 410 (Wash. App. 2018) ("The

17  immunity does not privilege ministerial or operational government acts.").   "[T]he doctrine of

18  discretionary immunity has no bearing on cases" like the one at bar, which "do not involve policy

19  decisions made by a coordinate branch of government."  *Watness v. City of Seattle*, 481 P.3d 570,

20  584 n.19 (Wash. App. 2021).  This affirmative defense should be dismissed.

21

22

23

24

---

[88] Dkt. # 50, at 14.

25  [89] Dkt. # 39, at 8, 20, 24.

PLAINTIFFS' MOTION FOR
JUDGMENT ON THE PLEADINGS - 15

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

**C.   DEFENDANTS PRITCHARD AND ANDREWS' FIRST, SECOND, THIRD, FOURTH, FIFTH, SIXTH, AND EIGHTH AFFIRMATIVE DEFENSES SHOULD BE DISMISSED.**

**1.   Defendants Pritchard and Andrews' First, Third, Fourth, Fifth, and Eighth Affirmative Defenses Should Be Dismissed.**

Defendants Pritchard and Andrews assert in their first (failure to state a claim), third (public duty/good faith immunity) fourth (comparative fault), fifth (failure to mitigate), and eighth (discretionary immunity) affirmative defenses the same as the County Defendants have asserted, discussed above.[90]  They should also be dismissed, for the same reasons.

**2.   Defendant Pritchard and Andrews' Second Affirmative Defenses Should Be Dismissed.**

Defendant Pritchard and Andrews assert "[t]hat qualified immunity precludes plaintiffs' claims."[91]  But "privately employed medical providers who contract with the government to care for inmates' health needs" are categorically *not* entitled to qualified immunity.  *Roundtree v. Correct Care Sols.*, No. 19-0167, 2021 WL 981309, at *6 (D. Colo. Mar. 16, 2021); *see also Garner v. Mohave Cty.*, No. 15-08147, 2016 WL 695820, at *3 (D. Ariz. Feb. 22, 2016) ("[T]he defense of qualified immunity is not available to the individual medical defendants.").  This has been the law in the Ninth Circuit for over twenty years.  *Jensen v. Lane County*, 222 F.3d 570, 576 (2000); *see also, e.g., Scott v. California Med. Grp.*, No. 16-3084, 2017 WL 10434016, at *10 (C.D. Cal. Oct. 30, 2017).  Defendant Pritchard is a contracted nurse, employed by Northwest Regional Counsel ("NRC"), a business that provides the Jail with medical, psychiatric, and dental care to inmates—in exchange over a million dollars a year.[92]  Defendant Andrews, the Jail's Nursing Supervisor, is also employed by NRC.[93]  This affirmative defense should be dismissed.

---

[90] Dkt. # 45, at 16; Dkt. # 51, at 16.
[91] Dkt. # 45, at 16; Dkt. # 51, at 16.
[92] Dreveskracht Decl., Exhibit 110, at 5; *see also generally* Dreveskracht Decl., Exhibit 111.
[93] Dreveskracht Decl., Exhibit 115; Dreveskracht Decl., Exhibit 116, at 2.

PLAINTIFFS' MOTION FOR
JUDGMENT ON THE PLEADINGS - 16

### 3. Defendant Pritchard and Andrews' Sixth Affirmative Defense Should Be Dismissed.

Defendants Pritchard and Andrews assert that "the plaintiffs' claims are barred by the statute of limitations."[94]    Kirk died on June 4, 2018.[95]  "In Washington, the appropriate statute of limitations for 42 U.S.C. § 1983 claims is three years."  *Deleon v. City of Yakima*, No. 05-3083, 2006 WL 2253085, at *1 (E.D. Wash. Aug. 4, 2006).  "The statute of limitations for a wrongful death action in Washington is three years" too.  *Barabin v. AstenJohnson*, No. 14-0557, 2014 WL 2938457, at *2 (W.D. Wash. June 30, 2014).  Plaintiffs' Complaint was filed on July 20, 2020.[96] And not that it matters, but their Second Amended Complaint was filed on April 8, 2021[97]—roughly two months before the statute of limitations was triggered.  There is no basis in law or fact for Defendants Pritchard and Andrews' sixth affirmative defense.  It should be dismissed.

### D. COMPASS DEFENDANTS' FIRST, SECOND, THIRD, FOURTH, FIFTH, SEVENTH, AND TENTH AFFIRMATIVE DEFENSES SHOULD BE DISMISSED.

### 1. Compass Defendants' First, Second, Seventh, and Tenth Affirmative Defenses Should Be Dismissed.

Compass Defendants assert in their first (failure to state a claim), second (failure to mitigate), seventh (comparative fault), and tenth (public duty/good faith immunity) affirmative defenses the same as the County Defendants have asserted, discussed above.[98]  They should also be dismissed, for the same reasons.

### 2. Compass Defendants' Third, Fourth, and Fifth Affirmative Defenses Should Be Dismissed.

Compass Defendants' third (proximate cause), fourth (superseding cause), and fifth (preexisting condition) affirmative defenses are not affirmative defenses at all.  *Hiramanek v. Clark*,

---

[94] Dkt. # 45, at 16; Dkt. # 51, at 16.
[95] Exhibit 66, at 1.
[96] Dkt. # 1.
[97] Dkt. # 39.
[98] Dkt. # 52, at 22-23.

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

No. 13-0228, 2015 WL 693222, at *2 (N.D. Cal. Feb. 18, 2015).  An affirmative defense absolves a defendant of liability "even where the plaintiff has stated a *prima facie* case for recovery." *Quintana v. Baca*, 233 F.R.D. 562, 564 (C.D. Cal. 2005).  An attack on a plaintiff's case in chief is not an affirmative defense.  *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002). These affirmative defenses should be dismissed.  *See Zivkovic*, 302 F.3d at 1088 ("A defense which demonstrates that plaintiff has not met its burden of proof is not an affirmative defense."); *Hays v. Gen. Elec. Co.*, 151 F. Supp. 2d 1001, 1014 (N.D. Ill. 2001) ("Proximate cause is an element of the plaintiff's case, not an affirmative defense."); *F.D.I.C. v. Mahajan*, 923 F. Supp. 2d 1133, 1141 (N.D. Ill. 2013) (striking "affirmative defenses of lack of proximate cause and intervening/superseding cause" as they are "not properly pleaded as an affirmative defense").

## IV.   CONCLUSION

While "lawyers routinely file kitchen-sink affirmative defenses" in state court, "[i]n federal court, greater adherence to the rules is required." *Vogel*, 291 F.R.D. at 442.  Plaintiffs respectfully request that the above-indicated affirmative defenses be dismissed as follows:

- The County Defendants' **Second, Third, Fourth, Fifth, Sixth, And Seventh** Affirmative Defenses Should Be Dismissed.

- Defendants Pritchard and Andrews' **First, Second, Third, Fourth, Fifth, Sixth, and Eighth** Affirmative Defenses Should Be Dismissed.

- Compass Defendants' **First, Second, Third, Fourth, Fifth, Seventh, and Tenth** Affirmative Defenses Should Be Dismissed.

Respectfully submitted this 10th day of August, 2021.

GALANDA BROADMAN, PLLC

s/Ryan D. Dreveskracht
_____
Ryan D. Dreveskracht, WSBA #42593
s/Gabriel S. Galanda
_____
Gabriel S. Galanda, WSBA #30331
Attorneys for Plaintiffs
P.O. Box 15146 Seattle, WA 98115
(206) 557-7509 Fax: (206) 299-7690

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Email: ryan@galandabroadman.com
Email: gabe@galandabroadman.com

## CERTIFICATE OF SERVICE

I, Wendy Foster, declare as follows:

1.      I am now and at all times herein mentioned a legal and permanent resident of the United States and the State of Washington, over the age of eighteen years, not a party to the above-entitled action, and competent to testify as a witness.

2.      I am employed with the law firm of Galanda Broadman PLLC, 8606 35th Avenue NE, Ste. L1, Seattle, WA 98115.

3.      Today I served the foregoing document, via this Court's ECF system, on all Defendants.

The foregoing Statement is made under penalty of perjury and under the laws of the State of Washington and is true and correct.

Signed at Seattle, Washington, this 10th day of September, 2021.

s/Wendy Foster
Wendy Foster

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509