1
2
3
4
5
6

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

7

8

9

10

11

12

13

14

| | |
|---|---|
| CARRIE A. ANDERSON, in her Personal Capacity and as Personal Representative of the ESTATE OF KIRK DANIEL POWLESS, deceased; *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WHATCOM COUNTY, a political subdivision of the State of Washington; *et al.*,<br><br>Defendants. | NO.   2:20-cv-01125-TSZ<br><br>**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>NOTE ON MOTION CALENDAR:<br>October 8, 2021 |

## I.      INTRODUCTION

15

16

For over a decade, Whatcom County has operated its jail in an unsafe, inhumane, and

17

unconstitutional manner.  County officials at the highest echelon know this, publicly acknowledge

18

it, and have admitted it under oath in this action.[1]  As a result, numerous inmates have died—

19

including Shannon Jefferson on March 10, 2014; Eric Aybar, eight days later; Timothy Drafs, on

20

May 28, 2015; Paula Jefferson, on August 10, 2017; and Kirk Powless on June 4, 2018.[2]

This must stop.

21

Plaintiffs move for summary judgment under Fed. R. Civ. P. 56 because no questions of

22

material fact exist as to Plaintiffs' *Monell* and negligence claims.

23

24

25

[1] Declaration of Ryan D. Dreveskracht ("Dreveskracht Decl."), Exhibit 13, at 12-16 (deposition transcript pages referenced as originally paginated).
[2] Dreveskracht Decl., Exhibits 1-5.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 1

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1

**II.     FACTS**[3]

2     Kirk Powless was a pretrial detainee when died in the custody of Whatcom County Jail

3 ("Jail") on June 4, 2018.[4]  The cause of death was determined to be "[a]sphyxia by ligature hanging"

4 with "illicit substance usage" as a contributory factor.[5]  "Aspects of the brain indicated abnormal

5 (low) dopamine levels," indicating that Kirk was experiencing severe withdrawal at the time of his

6 suicide.[6]  Video surveillance shows that from 6:54 a.m. until he was found dead at 11:07 a.m., not

7 a single Jail employee or contractor looked into Kirk's cell.[7]

8     Whatcom County ("County")'s Critical incident Review ("CIR") recognized that Kirk could

9 have "been put on withdrawal protocol due to his history of drug abuse."[8]  The Complex Patient

10 Review conducted by Dr. Stewart Andrews also recognized that inmate supervision was

11 problematic in Kirk's case and recommended "video surveillance of cells."[9]

12     Somewhat incongruously, the CIR also concluded that the Jail "was appropriately staffed

13 and that staff responded to the incident according to jail policies and procedures."[10]  Dr. Andrews

14 and Kristine Glasgow, the County's Jail Health Administrator, also agreed that staff "followed

15 procedures and practices both leading up to and during" Kirk's death.[11]  The County has confessed

16 that in all instances pertaining to Kirk's care each and every "employee, agent, or subcontractor"

17 acted consistently with the Jail's policies and established practices.[12]  A number of these policies

18

19

20

---

[3] Plaintiffs hereby incorporate by reference the facts and evidence provided in support of their Motion for Judgment on the Pleadings, Dkt. ## 64-66.

21 [4] Dreveskracht Decl., Exhibit 64, at 1.

[5] *Id.*, at 2.

22 [6] *Id.*; *see also generally* Dkt. # 55.

[7] Dreveskracht Decl., Exhibits 80-81.

23 [8] Dreveskracht Decl., Exhibit 5, at 7.

[9] Dreveskracht Decl., Exhibit 122.

24 [10] *Id.*, at 9; *see also id.*, at 11 ("The review board did not find any indication that any policy or practice was not followed.").

[11] Dreveskracht Decl., Exhibit 5, at 10.

25 [12] Dreveskracht Decl., Exhibit 31, at 10-11; *see also* Dreveskracht Decl., Exhibit 115, at 19.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

and established practices resulted not only in Kirk's death, but at least three additional suicides in the four years prior.[13]  They are identified below.

**A.    SECURITY CHECKS / JAIL DESIGN**

Jail Policy No. 306, which governs "Security Checks," reads in relevant part as follows:

Deputies assigned to the main jail and working second or third floor will conduct security checks a minimum of once per hour.  Security checks will include:

- A visual inspection of each module.
- A visual inspection for any obvious problems.
- **A visual inspection verifying inmate welfare**.

Deputies will document all security checks in their daily floor logs.[14]

The County's Inmate Orientation Manual solidifies the third bullet point relating to the verification of inmate welfare: "**It is mandatory that inspecting Deputies see you** . . . ."[15]

At the time of Kirk's death, however, the County's established practice was to deem such interactions as "speak[ing] to inmates . . . via the control panel"; "open[ing] the chow hatch" to the unit and "giv[ing] meds to inmates at the hatch"; and "put[ting] cleaning gear into" the unit as "security checks."[16]  This is because "[n]o portion of the Jail was designed for direct supervision" and "[v]isibility from the corridors into the living areas is poor."[17]  As Described by the Whatcom County Chief of Corrections, Wendy Jones:

A.  [T]he facility in 1980 . . . was originally designed for some form of direct supervision. . . .

Q.  Got you.  When you say that the facility was originally designed to be a direct supervision facility, what do you mean?  Can you elaborate on that a little bit for me?

A.  My understanding was that – especially the second floor – [the Jail] was originally designed to have a deputy in the housing unit. . . .

---

[13] Dkt. # 54-1, at 30-32.
[14] Dreveskracht Decl., Exhibit 70 (emphasis added).
[15] Dreveskracht Decl., Exhibit 71, at 11 (emphasis in original).
[16] Dreveskracht Decl., Exhibit 31, at 14-15.
[17] Dreveskracht Decl., Exhibit 72, at 5.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 3

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Q.  Right.  So as it was originally designed, to the best of your understanding, you would have a jail deputy inside the tank or the unit who was then able to observe the inmates from inside the unit; is that correct?

A.  That's what direct supervision is, yes.

Q.  Okay.  And I presume, then, that, as originally designed, the person who was inside the unit then was able to look into the cells inside that unit; is that right?

A.  Depending on where our deputy station would be, they would have to get up and be up and walking around rather than at a deputy station.

Q.  Right. And do you know why the change from a direct supervision to, I assume, not a direct supervision housing as currently and also in 2018? . . .

A. To my knowledge, the County never anticipated that the facility would work as a direct supervision facility. . . . [W]e don't have deputies assigned inside of the units . . . .[18]

Whatcom County Sheriff Bill Elfo has elaborated:

> We don't have sufficient staffing to implement direct supervision, where the deputy would actually be in the cell block with the inmates to have better control. We're not staffed for that . . . . [A]s to direct supervision, that concept relates to having a deputy assigned in the cell block to provide closer supervision to the inmates and be able to observe and pick up on signs and trends.  We've never been staffed to be able to do that sufficiently.  Let me rephrase that.  We've never been sufficiently staffed to do that. . . .  It's a linear jail.  There is a number of cell blocks that we would have to have a deputy assigned to each one of them, and we just don't have the adequate staffing to be able to do that.  And we also don't have the station where the deputy would be within the cell blocks now.  So we don't have the design or the equipment to do that.[19]

The County's attempt to tackle this problem over the years has been rife with difficulty.  On October 12, 2007, the Jail's Operations Lieutenant, Ernie Stach, emailed that "[s]ecurity checks should be done with 2 Deputies" so that they could enter each unit and conduct direct-view security

---

[18] Dreveskracht Decl., Exhibit 42, at 14-17.
[19] Dreveskracht Decl., Exhibit 13, at 13-14; *see also id.*, at 14 ("Q.  So as it is now, deputies, are they able to see into each cell from outside the unit?  A.  No.").  Chief Jones has also admitted that the security check policies are caused by a lack of staffing:
    Q. . . . [I]t looks like walk-throughs at these other facilities are done at least every hour, right?
    A.  There's some sort of contact every hour, yeah. . . .
    Q.  And when the other times when it's come up, it's been proposed that you change the way that you do your security checks and change it to more the walk-through model that looks like what other jails use. Why haven't you changed your security check policy?
    A.  Part of it has been that we don't have the staff available to do that on a regular basis because it would take two or three people to be able to do that. And during busy day shifts and swing shifts that would be difficult.
Dreveskracht Decl., Exhibit 42, at 96-97.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT -4

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

checks securely.[20]  In a 2010 memo, authored by Chief Jones, though, it was recognized that deputies were confused about their duties:

> Early communications about the walk-through checks referred to them a separate from the security checks mandated by Jail Policy 306 (Security Checks).  However, by early 2009, communications to employees began to refer to them collectively. The differences between the two were clear to some employees with whom I spoke, but not to others.[21]

On December 5, 2014, Lieutenant Stach wrote in an email to Chief Jones and her fellow policymakers:

> [H]have we moved away from our standard operating procedures or do we deputies adopting their own procedures?  . . . [O]ur attention to detail requires attention to detail as well as that of our security checks **when we peer into the cells**.  I guess the question would be, if we're missing the obvious, what exactly are we observing?  Please address these issues at Shift Brief.[22]

While it is unclear if this issue or the difference between "cell checks" and "walk-through checks" was addressed at the "Shift Brief," it was clear, "across the board, that the regularity of security checks . . . are not consistent."[23]

In August of 2015 Sergeant Glenn Fair sent out an email indicating that other municipalities in the state conduct direct-view security checks at least every hour.[24]  Then, in December of 2015 the following email exchange occurred between Jail staff and administrators:

> Just a point of clarification concerning Security Checks. I thought since we had cameras in the cells we no longer had to walk into the tanks we Just [sic] had to walk down the hallway every hour looking into the tanks unless we saw something that appeared to be a rules violation during the said security check. . . . Thanks for the enlightenment regarding this issue. . . .

> The term "Walkthrough" needs to be defined and addressed separately from Security Checks because I guarantee (99%) that the Main Jail are not walking through the open tanks . . . every hour. . . .

---

[20] Dreveskracht Decl., Exhibit 73.
[21] Dreveskracht Decl., Exhibit 74.  To be clear, a "walk-through" requires "looking for each specific inmate and their welfare" whereas a "security check" requires looking into the window of a group "housing unit to make sure that nothing is out of the ordinary." Dreveskracht Decl., Exhibit 83, at 73-74.
[22] Dreveskracht Decl., Exhibit 75 (emphasis added).
[23] Dreveskracht Decl., Exhibit 76.
[24] Dreveskracht Decl., Exhibit 77.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

> When I was doing security checks . . . I could not see that well so I just walked down the middle, took a quick look into the shower area and got out. . . . Just out of curiosity, what is the down side to walking through the tanks?

> The only down side that I see is that there is a slight risk of assault. . . . Usually when I am doing a Security check I do a quick count and if I don't see someone then I go in other wise I don't.[25]

By February of 2019 it appears that the County had attempted to introduce "a new policy . . . to complete 100% cell checks every hour,"[26] but the "new policy" was not implemented, due to "staffing concerns" voiced by the deputy's union, Teamsters Local 231.[27]

Regardless, at the time of Kirk's death, the Jail's policy and established practice was clear: "**you're walking by the unit, you glance in, that's a security check.**"[28] Direct-view safety checks were not required.[29] This is policy was confirmed by Sheriff Elfo:

> Q. Can you describe for me the security check policy at the jail in the second floor units?
>
> A. There is a check that's done once an hour . . . .
>
> Q. What does that check consist of? . . .
>
> A. Walking by and checking activity inside the cell block.
>
> Q. Does that mean walking by the unit or walking by each cell inside the unit?
>
> A. Walking by the unit.
>
> Q. And just looking into the window?
>
> A. Yes.[30]

As Deputy Beaulieu elaborated:

> Q. . . . So you're trained to do security checks by walking by the unit and looking into the window. Is that correct?
>
> A. Yes. That is correct.
>
> Q. Okay. And what about -- before, you were telling me about how you could tell from the outside of the panel when an inmate had his door shut. Correct?

---

[25] Dreveskracht Decl., Exhibit 78.
[26] Dreveskracht Decl., Exhibits 79, 82.
[27] Dreveskracht Decl., Exhibit 79; Exhibit 83, at 78-79; Exhibit 115, at 37-38.
[28] Dreveskracht Decl., Exhibit 57, at 21 (emphasis added).
[29] *See* Dreveskracht Decl., Exhibit 42, at 95-96 (noting that "walk-throughs," where a deputy "will just kind of walk through the housing unit" and is "able to observe, peek into the windows of each individual cell" are "not required at the Whatcom County Jail").
[30] Dreveskracht Decl., Exhibit 13, at 16-17.

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

A.  Yes.

Q. Okay. What about if someone was in their cell and they had their door shut? . . . [T]here were cells that you couldn't see into from the hallway, looking of into the unit from the outside.  Is that correct?

A. That is correct.

Q.  Okay.  So if someone was locked in their cell and you would see on the panel, on the outside, that they had locked themselves into their cell, that meant that you weren't able to observe them. Is that correct?

A. Some cells, you could. I mean, they do have a glass window on their doors inside. Depending on the angle of where they're at, you can look into their window and observe them from there. . . .

Q. So the cell that Mr. Powless was in, you couldn't see into that one.  Is that correct?

A.  You could see partially into that one.

Q.  Okay.

A.  Not the full cell, though.

Q.  And if you were doing your security checks and you saw that someone had locked themselves in their room, and, therefore, you couldn't see them or you couldn't -- you potentially couldn't observe them depending on where they were, was there any protocol on how to check on those individuals?

A.  No. . . .

Q.  . . . [H]ypothetically, if an inmate goes out at 8 in the morning and he decides that, "I don't want to be out, I want to be in my cell by myself," the next time that he would be personally observed from a jailer would be around four hours later. . . . And that was the County's policy in the summer of 2018.  Correct?

A.  Yes. . . .

Q. . . . So we know that at some point, Mr. Powless was hanging from the door. That's ultimately how he ended up, unfortunately, committing suicide.  Correct?

A.  That is correct.

Q. Were you able to -- would you have been able to see him from the window into the unit, looking into his cell?

A.  From the position he was at, no.

Q. Okay. Meaning that the only way that you would identify Mr. Powless hanging is from entering into the unit and looking into the cell window. Is that correct?

A.  That's correct. [31]

Sargent Barry Lovell described the policy and established practice as it relates to Kirk as follows:

A.  . . . We do our visual inspection through the sally port window.

---

[31] Dreveskracht Decl., Exhibit 32, at 25-28, 34.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 7

Q.  Got you.  So potentially an inmate could be in their cell with the door closed, and they would not be observed for -- for a substantial period of time because you just look into the unit through the unit window.  You don't look in individual cells; is that correct?

A.  That is correct. . . .

Q.  Okay.  And the policy currently is that -- as you described it, that a security check involves just looking into the window in a unit, not actually looking into the individual cells during the day shift in the second floor, correct?

A.  That's correct. . . .

Q.  . . . [W]as Deputy Ignashova supposed to that day observe and check on all the inmates on the second floor by herself?

A.  She would have been primarily responsible for second floor.  That was her duty station, yes. . . .

Q.  Did anyone enter 2 Adam and look into Kirk's cell during the time that he closed the door and when he was found deceased? . . .

A.  If memory serves me correctly, the only deputy that entered 2 Adam during that timeframe was Deputy Charroin.  And it *does not* appear from my recollection of the video that he looked specifically into -- I believe it's 2 Adam 4.

Q.  Would that comply with Whatcom County's policies and established practices?

A.  I believe so, yes.

Q.  So it's okay that an inmate is in his cell by himself and not observed for a number of hours?

A.  That is what policy allows, yes. . . . In my opinion, we need a new jail.  It's poorly designed. . . . Linear design jails are not the industry standard anymore. Direct supervision is.[32]

## B.   ACCOMMODATIONS FOR INMATES WITH SUBSTANCE ABUSE AND MENTAL HEALTH ISSUES

Roughly "85% to 90%" of the Jail's "incoming offenders are intoxicated on alcohol, some type of drug or both."[33]  A 2011 United States Department of Justice ("DOJ") report put the County on notice that it was failing to provide "appropriate accommodations for inmates with substance abuse and mental health issues."[34]  In 2015, Dr. Stewart Andrews, the Jail's supervising physician, informed supervising and policymaking County officials that "[h]eroin withdrawal is on the rise,"

---

[32] Dreveskracht Decl., Exhibit 115, at 29-30, 38-39, 48, 50, 52-53 (emphasis added).
[33] Dreveskracht Decl., Exhibit 84.
[34] Dreveskracht Decl., Exhibit 72, at 6; *see also id.*, at 7 (noting a need for "housing areas for those mentally ill inmates requiring specialized housing and observation" and "space for expanding behavioral health evaluation and treatment").

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

that a protocol needed to be developed to "include Seizure precautions with assessments done daily,"[35] and that the Jail has "many, many patients who come in who have just used heroin before entering the door [and] most will go through withdrawal, [which] usually maximizes on day three."[36]  Dr. Andrews was also aware that "with opiates, [suicide] is a recognized thing to be watchful for" as "a possibility when they go through withdrawal."[37]

On June 1, 2018—three days prior to Kirk's death—an inmate by the name of Gabriel Kortlever filed a grievance form with the Jail:

> I would like to grieve the policy concerning the prohibition of Medication Assisted Treatment ("MAT") to individuals with opiod [sic] use disorders. The usage of MAT for opiod [sic] use disorders is a form of medical care and should be viewed as such. Denial of access to these medications is a discriminatory action aimed directly at individuals with opiod [sic] use disorders.[38]

On June 22, 2018—eighteen days after Kirk's death—Lieutenant Caleb Erickson responded: "We are in the process of setting up a program for [MAT]."[39]  At the time of Kirk's death, though, the established practice at the Jail was to ignore these patients.  Kirk was not offered any withdrawal treatment at all, nor was he put on the first floor or directly observed.  Dr. Andrews, the Jail's supervising physician, has approved of and ratified this practice regarding Kirk's care:

Q.  . . . [Y]our role at the jail [is] overseeing the medical care that's provided by nurses, right?

A.  Yeah.

Q.  And in Mr. Powless's case, despite the fact that he came in and said that he used heroin prior to being booked and that he uses a gram of heroin a day, a decision was made to not monitor him.  And you, as the supervising physician, are okay with that determination by nursing staff; is that right? . . .

A.  Yes.[40]

---

[35] Dreveskracht Decl., Exhibit 85.
[36] Dreveskracht Decl., Exhibit 16, at 55.
[37] *Id.*, at 33-34.
[38] Dreveskracht Decl., Exhibit 86.
[39] *Id.*  During September of 2018, the Jail implemented a Medication-Assisted Therapy ("MAT") program, "providing a 3 day taper of Suboxone to patients beginning withdrawal from opiates."  Exhibit 87, at 5.
[40] Dreveskracht Decl., Exhibit 16, at 69-70.  Dr. Andrews' actual supervision over the nursing care is questionable.  *See generally id.*, at 16-18, 99, 106.

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1

## C.  UNDERSTAFFING AND OVERCROWDING

2    The staffing level at the Jail has "not changed in years," yet "demands on staff working the

3 floors has increased significantly."[41]  "[T]he jail has effectively been on an 'emergency suspension

4 of standards' almost continuously since 1987, due to the level of overcrowding."[42]  Shifts are

5 "comprised of a Sergeant and 5 Corrections Deputies for the entire jail."[43]  As Deputy Beaulieu

6 testified: "The whole time I've been there, the jail has been understaffed."[44]

7    Part of the increased demands pertain to the influx of persons with serious mental illness,

8 like Kirk.  As Sheriff Elfo wrote in 2017:

9    Our jails and prisons are becoming the *de facto* mental health institutions of our
     country. The number of seriously mentally ill people held on criminal charges in
10   the Whatcom County Jail has increased significantly over the past decade. The
     County Jail operates at nearly twice its designed capacity and very little space exists
11   for special housing and treatment of these offenders.[45]

12 This followed up on a 2015 article where Sheriff Elfo wrote:

13   America is experiencing a disturbing and increasing trend in the number of
     offenders having serious and dangerous forms of mental illness and addiction issues
14   that are housed in county jails. The Whatcom County jail is no exception. . . . The
     Whatcom County Jail operates at nearly twice its designed capacity and lacks
15   sufficient space to safely house, manage or optimally treat those with serious forms
     of mental illness or addiction issues.  Offenders requiring close monitoring are
16   housed in busy booking area that operates 24-hours a day. . . . The lack of
     appropriate housing also creates enormous safety issues for staff and other inmates.
17   Overcrowded conditions often aggravate existing mental health symptoms.[46]

18 Sheriff Elfo has also testified that during the Summer of 2018 there was not "sufficient space for

19 treating those with mental illness," which he rightfully recognized as an "enormous liability

20

21 ───────────────
[41] Dreveskracht Decl., Exhibit 89.
22 [42] Dreveskracht Decl., Exhibit 90.  In fact, rather than come into compliance with its own Standards for Correctional
Facilities, Whatcom Cty. Code, Ch. 1.28, in the summer of 2020 the County "temporarily suspended" this portion of
23 its County Code, Dreveskracht Decl., Exhibit 91, in order to avoid "potential civil liability."  Dreveskracht Decl.,
Exhibit 90.
24 [43] Dreveskracht Decl., Exhibit 84.  This is pursuant to the County's official policy on staffing levels.  Dreveskracht
Decl., Exhibit 92.
[44] Dreveskracht Decl., Exhibit 32, at 16.
[45] Dreveskracht Decl., Exhibit 93.
25 [46] Dreveskracht Decl., Exhibit 94.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

issue."[47]  The same with inmates experiencing withdrawal from drugs and/or alcohol:

> A substantial number of people in the jail suffer from severe and dangerous forms of mental illness and/or undergo withdrawal from drugs and/or alcohol.  While professional staff are contracted to address these issues, the facility lacks any semblance of adequate capacity for doing so. . . . Whatcom County is obligated to operate its county jail system in a safe, humane and constitutional manner.  Today, it is often nearly impossible to meet those required conditions. . . . [The n]umber of inmates with substance abuse and mental health issues keeps increasing, but [the] jail lacks sufficient and appropriate accommodations. . . . We don't have the physical infrastructure, from my perspective, to provide adequate behavioral health, mental health, or substance abuse treatment evaluation and housing.[48]

Overcrowding also resulted in overreliance on telephone medical consults with potentially withdrawing patients when more frequent and direct supervision in the medical unit was required by official policy.[49]  Dr. Andrews has also acknowledged the problems with: "the cells exceeding their design capacity, a lack of appropriate accommodations for inmates with substance abuse or mental health issues, [and] the lack of confidential medical interview capacity . . . ."[50]  As one corrections deputy put it, "it's generally almost always full on the first floor."[51]  Heidi Zosel, the Jail's mental health clinician that called Kirk over the in-unit phone in an attempt to conduct a suicide risk assessment, described the situation as follows:

> [W]e are so understaffed. There is one or two of us on any given day to meet the needs of 150 people, potentially. So we do not do ongoing counseling or therapy. Our interventions are brief, solution focused, crisis related.  So that's what this is about. And it really also is about us needing just more staff.  You know, it would be nice -- now we have an additional room where we can talk to people one on one in a private setting. But that's what this is about.  It would be nice to have more mental health staff. . . . I mean, two people for 200 people is understaffed, in my opinion. . . . I don't have my own office, for example.  Maybe if I did have my own office—now we have a more private room where I can talk to people, but we didn't then.  We're limited by the facility.  So I couldn't talk to people one on one -- if

---

[47] Dreveskracht Decl., Exhibit 13, at 15-16.
[48] Dreveskracht Decl., Exhibit 13, at 23-26.
[49] Dreveskracht Decl., Exhibits 40, 43, 55; *see also* Dreveskracht Decl., Exhibit 41 ("Patients being monitored for alcohol and other drug problems are housed on the first floor until the withdrawal protocol is completed."); *cf.* Dreveskracht Decl., Exhibit 42, at 70-71 ("Q. . . . [M]r. Powless was likely detoxing from heroin, correct? . . . A.  I would anticipate if Kirk had in fact taken the heroin he reported he did, he would probably be going through some type of withdrawal symptoms, yes.  Q.  And he wasn't put on the first floor or treated medically, correct?  A.  That's correct.").  The first floor is a "direct supervision unit."  *Id.*, at 23.
[50] Dreveskracht Decl., Exhibit 16, at 101.
[51] Dreveskracht Decl., Exhibit 117, at 33.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 11

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

they wanted to have some therapy or something, I couldn't do that as easily.  And, also, being understaffed, I'm pulled in five different directions at once. So that's limitation of the facility and of the system.[52]

And Sally Andrews, the Jail's Nursing Supervisor, has testified:

Q. Was there any discussion about increasing the frequency that you house people on the first floor? . . .

A.  There was some discussion regarding putting people down there, but again, I believe space was usually an issue. . . .

Q.  What happens when an inmate is on the first floor? Are they more closely monitored? . . .

A. Yes, they are. . . . There is a nurse that was given that job for the day to be first floor nurse.  And Mental Health spent a good amount of time on the first floor.

Q. So correct me if I'm wrong, but it sounds like you all determined that housing inmates on the first floor would have been one way to more closely monitor individuals who refused to speak with Medical.  Is that right? . . .

A. Yes.

Q.  But you indicated earlier that that wasn't done, because you said space was an issue.  Right? . . .

A. Was not always done.

Q. Because space was an issue, right?

A. Yes.

Q.  What did you mean by space was an issue?

A. A number of rooms maybe already had three people in them.  There weren't beds for people down there.

Q. And by "down there," you mean on the first floor.

A. On the first floor, yes.[53]

As to nursing, specifically, the County contracts with Northwest Regional Counsel ("NRC") to save costs.[54]  NRC pays its staff  "15% below average market rates," savings which are then passed onto the County.[55]  The downside of NRC's ability to pay lower than market wages, however—especially "when coupled with the environment at the jail"—it that it is "very difficult

---

[52] Dreveskracht Decl., Exhibit 114, at 81-84.
[53] Dreveskracht Decl., Exhibit 120, at 85-87.
[54] *See* Exhibit 118 ("[W]e have looked at moving the nursing program to the County, but determined that it would be significantly more expensive than contracting this service out.").
[55] *Id.*

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

to find qualified nurses."[56]  So difficult, in fact, that Nurse Andrews resigned.[57]  As she wrote in her resignation letter:

> [T]he hurdle I could not surmount was staff turnover.  Our efforts were repetitively compromised by losing seasoned employees just as they were getting comfortable in the job and self-directed.  Ensuing short staffs reduced the moral of the remaining loyal troops.  This deficiency in optimal care, in turn demoralized me and my enthusiasm for the job.[58]

## III.     Law And Argument

**A.   LEGAL STANDARD**

> Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof.  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party.  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth.

*Coleman v. Am. Com. Ins.*, No. 09-5721, 2010 WL 2757246, at *2 (W.D. Wash. July 13, 2010), *aff'd*, 461 F. App'x 600 (9th Cir. 2011) (case citation and quotation omitted).  The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).  Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed."  *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888'89 (1990).

---

[56] *Id.*, at 1; *see also id.*, at 2 (noting that "a major factor in turn over in the nursing staff is salary").
[57] Dreveskracht Decl., Exhibit 121.
[58] *Id.*

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    **B.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR *MONELL* CLAIM.**

2        **1.    Elements of A *Monell* Claim**

3            To hold a municipality liable under § 1983, a plaintiff must show that the municipality's

4    "policy or custom" led to their constitutional injury.  *Valenzuela v. City of Anaheim*, No. 20-55372,

5    2021 WL 3362847, at *2 (9th Cir. Aug. 3, 2021) (citing *Castro v. County of Los Angeles*, 833 F.3d

6    1060, 1073 (9th Cir. 2016); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  "Even if no

7    explicit policy is identified, a plaintiff may still establish municipal liability upon a showing of a

8    permanent and well-settled practice by the municipality that gave rise to the alleged constitutional

9    violation."  *Brown v. Cty. of Siskiyou*, No. 16-1752, 2019 WL 4747707, at *5 (E.D. Cal. Sept. 30,

10   2019) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).  When "a municipal 'policy

11   or custom' is itself unconstitutional, *i.e.*, when it directly commands or authorizes constitutional

12   violations, **the causal connection between policy and violation is manifest and does not require

13   independent proof.**"  *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987) (quoting *Monell*,

14   436 U.S. at 661; citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822 (1985)).  In all other

15   instances, though, "[t]he plaintiff must also demonstrate that the policy or custom was adhered to

16   with 'deliberate indifference to the constitutional rights of its inhabitants," which "is 'always an

17   objective inquiry.'"  *Lucas v. Cty. of San Diego*, 20-1735, 2021 WL 568787, at *5 (S.D. Cal. Feb.

18   16, 2021) (quoting *City of Canton v. Harris*, 489 U.S. 378, 392 (1989); *Castro*, 833 F.3d at 1067).

19   Under this objective test, liability is "'premised on obviousness or constructive notice.'"  *Castro*,

20   833 F.3d at 1076 (quoting *Farmer v. Brennan*, 511 U.S. 825, 831 (1994)); *see also Gordon v. Cty.

21   of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018) (same).

22           A municipality has an "obligation to provide persons in its custody with a medical care

23   system that meets minimal standards of adequacy."[59]  *Drew v. Christian Cty.*, No. 13-3300, 2017

24

25   ---
     [59] The fact that a municipality has contracted out healthcare services does not relieve it of its constitutional duty to
     provide adequate care to those in its custody.  The duty is nondelegable.  *Roberts v. City of Bainbridge Island*, No. 21-

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

WL 937146, at *11 (C.D. Ill. Mar. 9, 2017) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). As part of this obligation, **pretrial detainees possess a constitutional "right to direct-view safety checks sufficient to determine whether their presentation indicates the need for medical treatment**." *Gordon v. Cty. of Orange*, 6 F.4th 961 (9th Cir. 2021) (emphasis added) (citing *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1076 (9th Cir. 2013)); *see also Morris v. Jeffreys*, No. 20-50320, 2021 WL 3187699, at *3 (N.D. Ill. 2021) ("'Suicide is a known risk in the custody setting, and occurs at higher rates than in non-custodial settings.' The growing suicide rate in prisons is alarming and the topic of extensive study. Mandatory cell checks are one way that prisons have tried to reduce that rate.") (quoting *Lapre v. City of Chicago*, 911 F.3d 424, 430 (7th Cir. 2018)).

### 2.  Law and Argument

Here, there is no question that Whatcom County's policies and established practices deprived Kirk of his right to direct-view safety checks. As discussed above, the County's safety check policy allowed inmates to go for five or more hours without any direct-view safety check.[60] And that is exactly what happened to Kirk. From 6:54 a.m. until he was found dead at 11:07 a.m., not a single Jail employee or contractor looked into Kirk's cell.[61] That the County's policy would result in the failure to conduct direct-view safety checks was obvious—the policy literally reinforced the opposite. This is one of the rare cases where "the causal connection between policy and violation is manifest and does not require independent proof." *Spell*, 824 F.2d at 1387 (4th Cir. 1987) (quoting *Monell*, 436 U.S. at 661; citing *Tuttle*, 471 U.S. at 822); *see also Tsao v. Desert*

---

5165, 2021 WL 3739125, at *3 (W.D. Wash. Aug. 24, 2021) (citing *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985)); *Jensen v. Pratt*, No. 12-0601, 2021 WL 3828502, at *14 (D. Ariz. July 16, 2021) (quoting *West v. Atkins*, 487 U.S. 42, 56 (1988)).
[60] *See, e.g.*, Dreveskracht Decl., Exhibit 57, at 19.
[61] Dreveskracht Decl., Exhibits 80-81; Dkt. # 54-1, at 33.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1   *Palace*, 698 F.3d 1128, 1144 (9th Cir. 2012) (discussing this "direct path" to *Monell* liability);

2   *Goodin v. City of Glendora*, 380 F. Supp. 3d 970, 993 (C.D. Cal. 2019) (same).

3       What is more, even if Kirk did not have a constitutional right to direct-view safety checks—

4   considering *Gordon*, he clearly did—the County's failure to conduct direct-view safety checks for

5   a pretrial detainee with Kirk's known serious medical needs was objectively unreasonable. *See*

6   *Valenzuela*, 2021 WL 3362847, at *3 (holding that a "facially unconstitutional" policy is not

7   required; "city policy need only cause the constitutional violation"). "[C]orrections officers have a

8   duty to reengage medical staff if an inmate's condition has significantly worsened since the inmate

9   received medical care." *Stojcevski v. Macomb Cty.*, 827 F. App'x 515, 522 (6th Cir. 2020); *see also*

10  *Wereb v. Maui Cty.*, 727 F. Supp. 2d 898, 923 (D. Haw. 2010) (same). Without direct-view safety

11  checks, this duty is cannot be fulfilled—as it was not fulfilled for Kirk. Again, "safety-checks are

12  designed with the purpose of ensuring that inmates are alive-and-well and to determine whether

13  they need any medical treatment . . . ." *Medina v. Cty. of Los Angeles*, No. 19-3808, 2020 WL

14  3964793, at *16 (C.D. Cal. Mar. 9, 2020); *see also Lynas v. Stang*, No. 18-2301, 2020 WL 4816375,

15  at *15 n.11 (D. Minn. Aug. 19, 2020) ("[S]uicide is a highly predictable consequence of policies

16  that allow ineffective inmate checks . . . .") (quotation omitted). As noted by Plaintiffs' correctional

17  healthcare expert, Dr. Robert Cohen:

18      Kirk Powless had multiple serious and known medical, mental health, and
        substance abuse problems . . . . Because of chronic overcrowding and chronic
19      understaffing, the [Jail] did not have sufficient security staff to enter into housing
        blocks, and therefore were unable to see into the cells. This is an extremely
20      dangerous situation which [Jail] senior staff and Whatcom County were aware of
        for years but did nothing to ameliorate. There was no direct supervision of
21      incarcerated persons and deputies were not stationed inside housing areas. . . .
        Whatcom County Jail and its medical staff were aware that Mr. Powless was
22      addicted to heroin and was likely to go into withdrawal. With this knowledge, they
        failed to house him in a unit which would facilitate observation and treatment. . . .
23      Whatcom County Jail and its medical staff were aware that Mr. Powless was at high
        risk for suicide but failed to provide him with any direct mental health services and
24      failed to house him in a unit which supported regular observation. Kirk Powless'
        suicide was preventable. Suicides are unfortunately common in jails and prisons,

25

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

but there are many things that can be done to prevent them.  For instance: . . . Assure that each incarcerated person in general population is personally observed hourly, that they are not in distress, and that deputies have direct observation of every cell every time they make rounds in housing areas . . . .  The healthcare policies and established practices maintained by [the Jail] were clearly unreasonable, . . . put inmates at serious risk of harm, and resulted in the death of numerous inmates, including Mr. Powless.  This would have been obvious.[62]

Plaintiffs' corrections expert, Phil Stanley, has offered similar testimony:

[S]ecurity checks by way of a walk-through of the cellblock every thirty minutes or at least hourly, should have been the policy and practice at the Whatcom County Jail. . . . The objective unreasonableness demonstrated by th[e] lack of contact and oversight of a mentally ill/withdrawing inmate is deplorable and demonstrates indifference to Mr. Powless' obvious, known, critical medical and mental health needs, in my opinion. Yet, in the follow up investigation, Deputy Ignashova was not criticized for her actions nor was there any subsequent disciplinary action. Instead, she was deemed to have acted in compliance with all Jail policies, and her acts and omissions were in fact approved and ratified . . . .[63]

Notably, the County's experts do not submit otherwise.[64]

While it is unfortunate that the Jail was "poorly designed" and is not "industry standard anymore," [65] and that the County does not "have sufficient staffing to implement direct supervision,"[66] these excuses are not a defense to a constitutional violation.[67]  "On the contrary, courts often cite evidence of systemic understaffing in support of a finding of deliberate indifference." *Georgia Advoc. Off. v. Jackson*, No. 19-1634, 2019 WL 12498011, at *12 n.27 (N.D. Ga. Sept. 23, 2019) (citing *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *Braggs v.*

---

[62] Dkt. # 54-1, at 33-36, 42.
[63] Dkt. # 54-2, at 20-21.
[64] *See generally* Dkt. ## 56-1 to 56-4; *see also* Dkt. # 59, at 25 ("I believe that the Jail Policy on cell checks should be revised.")
[65] Exhibit 115, at 52-53.
[66] Exhibit 13, at 12.
[67] Nor is it an excuse that Kirk did not reach out to request medical or mental health assistance on his final days.  If Whatcom County wishes to incarcerate withdrawing pretrial detainees in a general population cell, it has a constitutional responsibility to ensure that its conditions comport with the requirements of the Fourteenth Amendment. "And the protections of the Fourteenth Amendment do not hinge on whether a detainee makes an explicit request for medical care." *Sims v. City of Jasper*, Texas, No. 20-0124, 2021 WL 2349350, at *15 (E.D. Tex. June 9, 2021); *see also Fraihat v. U.S. Immigr. & Customs Enf't*, 445 F. Supp. 3d 709, 748 (C.D. Cal. 2020) (jailers possess "an affirmative duty to track disabilities and provide accommodations, because the population is detained"); *Ishmael v. Campbell*, 501 F. Supp. 3d 1034, 1051 (D. Colo. 2020) ("An incarcerated individual has been 'stripped of virtually every means of self-protection,' and 'the government and its officials are not free to let the state of nature take its course.'") (quoting *Farmer*, 511 U.S. at 833).

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 17

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

*Dunn*, 257 F. Supp.3d 1171 at 1256, n. 81 (M.D. Ala. 2017); *Newman v. Alabama*, 559 F.2d 283, 286 (5th Cir. 1977); *Ancata v. Prison Health Servs.*, 769 F.2d 700, 705 (11th Cir. 1985)); *see also Castro*, 833 F.3d at 1075 (noting that the design of a jail "is only the backdrop for the entity defendants' policy or custom").

Whatcom County had a choice.  "The County could pay on the front end to protect the constitutional rights of inmates by building a new jail" or enacting policies to compensate for its poor design, "or the County could pay on the back end by satisfying judgments in meritorious civil rights actions based on unconstitutional conditions at the Jail."  *Winton v. Bd. of Comm'rs of Tulsa Cty.*, 88 F. Supp. 2d 1247, 1268 (N.D. Okla. 2000).  Unfortunately, the County chose the latter.  As noted above, Sheriff Elfo, Chief Jones, and other Jail supervisors and policymakers have resigned to this reality.  While Plaintiffs have no doubt these County employees are doing the best they can with the limited resources available, "a lack of funds for facilities cannot justify an unconstitutional lack of competent . . . treatment for inmates."  *Wright v. Runnels*, No. 05-2530, 2008 WL 649205, at *5 (E.D. Cal. Mar. 6, 2008) (citing *Ancata v. Prison Health Servs.*, 769 F.2d 700, 704-05 (11th Cir. 1985)); *see also Demata v. New York State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999) ("[T]he state's responsibility to provide adequate prison medical care does not turn on cost considerations."); *Fields v. Corizon Health*, 490 F. App'x 174, 185 (11th Cir. 2012) ("[L]ack of funds cannot justify unconstitutional treatment of inmates.") (citation omitted); *Ross v. Sandoval*, No. 17-2386, 2018 WL 1977259, at *10 (D. Nev. Mar. 27, 2018) (the delivery of "constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them").

Plaintiffs are entitled to partial summary judgment on their *Monell* claim.  The issue of damages is the only thing to be determined at trial.  *See, e.g., Drew*, 2017 WL 937146.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

**C.      PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR NEGLIGENCE CLAIM.**

**1.      Elements of a Negligence Claim**

"To prevail on a negligence claim, a plaintiff must show (1) the existence of a duty to the plaintiff, (2) a breach of that duty, (3) a resulting injury, and (4) the breach as the proximate cause of the injury." *Mancini v. City of Tacoma*, 479 P.3d 656, 664 (Wash. 2021) (quotation omitted).

> "Duty" is the duty to exercise ordinary care, or, alternatively phrased, the duty to exercise such care as a reasonable person would exercise under the same or similar circumstances. "Breach" is the failure to exercise ordinary care, or alternatively phrased, the failure to exercise such care as a reasonable person would exercise under the same or similar circumstances.

*Mathis v. Ammons*, 928 P.2d 431, 434 (Wash. Ct. App. 1996) (footnotes omitted).

While "[i]t is readily agreed that jails owe inmates in their custody a duty to ensure health, welfare, and safety," the scope of that duty is typically determined by expert testimony. *Schmitt v. Faalogo*, No. 37974-4-III, 2021 WL 2800536, at *4 (Wash. Ct. App. July 6, 2021) (citing *Gregoire v. City of Oak Harbor*, 244 P.3d 924 (2010)). "Jails are complex institutions. Many of a jail's operational decisions require professional expertise outside the knowledge of an average juror" and "safety protocols involve the type of professional judgment that require expert assistance." *Id.*; *see also Gordon v. Kitsap Cty.*, 187 Wash. App. 1023 (Wash. App. 2015) (same); *Seybold v. Neu*, 19 P.3d 1068, 1074 (Wash. App. 2001) (same).

Important in this analysis, though, is that Washington State recognizes that a jail's "special relationship with inmates" creates "an *affirmative duty* to provide for inmate health, welfare, and safety." *Gregoire*, 244 P.3d at 929 (emphasis added). In other words, <u>a jail owes a "duty of care to protect the plaintiff from foreseeable harm, which borders on strict liability</u>." *Turner v. Washington State Dep't of Soc. & Health Servs.*, No. 99243-6, 2021 WL 3557309, at *5 (Wash. Aug. 12, 2021) (quotation omitted, emphasis added).

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

2.      **Whatcom County Breached its Duty to Keep Kirk in Health and Free from Harm, Causing Kirk's Death.**

a.      *Supervision*

Having put forward incontrovertible evidence that the County was deliberately indifferent for purposes of their § 1983 claims pertaining to Kirk's supervision, as demonstrated above, Plaintiffs have "manifestly put forward sufficient evidence tending to show that [its] actions represented a breach of the prevailing standard of care." *Nelson v. Prison Health Servs.*, 991 F. Supp. 1452, 1466 (M.D. Fla. 1997).  In addition, Plaintiffs' corrections and correctional healthcare experts have also concluded that the County's supervision of Kirk fell below the standard of care[68] and was a proximate cause of his death.[69]

b.      *Withdrawal Protocol*

The County's withdrawal protocol likewise fell below the standard of care and was a proximate cause of Kirk's death.  Per Plaintiffs' addiction medicine expert, Dr. Vern Williams:

> Mr. Powless was housed in the general population instead of the first floor where he could have monitored for suicide risk and heroin withdrawal. . . . No vitals or direct observations by medical staff were performed. . . . Heroin and methamphetamine withdrawals are difficult, heroin particularly so.  The physical effects are very uncomfortable and miserable; however it is the anxiety and exacerbation of depression that causes the greatest suffering.  This suffering superimposed on his history of PTSD, anxiety, and depression put Mr. Powless at high risk to suicide as the outcome demonstrates.  The Jail's own policies stress these risk factors—so corrections, medical, and mental health staff obviously were aware of them—yet he remained without increased monitoring, evaluation, or treatment. . . . [C]linically appropriate monitoring, evaluation, and treatment for withdrawal more likely than not would have prevented his death.[70]

Mr. Stanley has concluded similarly:

> At the jail, upon entering, [Kirk] was questioned by a jail officer and he stated that he had used heroin shortly before entering the Jail.  The arrest report shows he had heroin in his possession when he was arrested by the Bellingham Police.  This alone

---

[68] Dkt. # 54-1, at 33-36, 42; Dkt. # 54-2, at 20-21.
[69] Dkt. # 54-1, at 43; Dkt. # 54-2, at 21; *see also id.*, at 7 ("Whatcom County knowingly chose to utilize the Jail in a manner that it was not intended, took no steps to ensure for the safety and security of the inmates caused by its decision, and Mr. Powless died as a result.").
[70] Dkt. # 55, at 14.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 20

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

should have warranted a full physical assessment by medical staff to determine the degree of intoxication.  A detox protocol should have been started with Mr. Powless immediately, by medical staff, where more frequent observations would transpire and where medical and mental health interventions could be implemented.  This did not occur. . . . The Whatcom County Jail had explicit instructions on where to house inmates with significant suicide risk, mental health history, and/or drug withdrawal issues . . . . This policy was clearly not followed with Mr. Powless, who was assigned to be in a general population cellblock, in a cell by himself, where there was almost no direct observation or monitoring.  The failure to follow this policy, or to provide any semblance of care for Mr. Powless' obvious and known serious health issues, was objectively unreasonable and more likely than not resulted in Mr. Powless' untimely death. . . . The fact that Mr. Powless entered the jail under the influence of heroin and had heroin on his person when arrested should have resulted in automatic placement on a detox protocol, in my opinion. . . . [F]or some reason Mr. Powless, who had both a heroin addiction and past attempts at suicide, was not provided any intervention for either issue, which more likely than not would have prevented his death on June 4, 2018.[71]

Ms. Bartley, the County Defendants' corrections expert, opines that the County Defendants "provided constitutionally required minimum care" for Kirk's withdrawal because "[h]e was not exhibiting any signs of opiate withdrawal" and they thus had no reason to treat him.[72]  Ms. Bartley's opinion does not raise a question of material fact.

First, Ms. Bartley does not opine, or even imply, that the County complied with the standard of care.  Ms. Bartley only concludes that "[t]he Whatcom County jail provided **constitutionally required minimum care** to Mr. Powless while he was in their custody from May 30 – June 4, 2018."[73]  But since "mere malpractice, or even gross negligence, does not suffice" to prove a constitutional violation, whether the County met the higher "constitutionally required minimum care" is irrelevant to Plaintiffs' negligence claim.[74]  *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990); *see also Estelle*, 429 U.S. at 107 (same).  A "standard of care," on the other hand,

---

[71] Dkt. # 54-2, at 11-14.
[72] Dkt. # 56-1, at 40, 45
[73] Dkt. # 56-1, at 45 (emphasis added).  To provide just one example, Ms. Bartley opines that "[t]here is no indication from the outside of the cell that would alert any deputy looking into the housing unit that Mr. Powless was in the process of taking his life."  Dkt. # 59, at 25.  This is precisely the point.  While possibly sparing those jailers walking by the unit from being guilty of unconstitutionally and deliberately ignoring Kirk's obvious need for immediate assistance, the negligence on the part of the County to allow this situation to exist—an inmate with known serious but untreated medical conditions left alone with no observation for roughly four hours—is manifest.
[74] Dkt. # 56-1, at 45.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 21

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

is that range of activities that a reasonably prudent person or entity—here, a reasonably prudent jail and its employees—would take between, but not including, the ideal (or defensive practice) and the unreasonable (or reckless practice). *Foss v. State*, 183 Wn.App. 1034 (2014) (citing *McLaughlin v. Cooke,* 112 Wn.2d 829, 836, 774 P.2d 1171 (1989)).  A constitutional violation would fall *far* past the unreasonable category and into another realm, *i.e.* "deliberate indifference." *See Owens v. Stirling*, No. 16-2512, 2017 WL 1881150, at *2 (D.S.C. May 8, 2017) (noting the difference between "recognized constitutional standards of care" and ordinary negligence); *United States v. Mask*, 154 F. Supp. 2d 1344, 1352 (W.D. Tenn. 2001) (constitutional violations "require a higher degree of culpability than governmental negligence").  Because Ms. Bartley provides no standard of care opinion, she does not raise a question of material fact as to Plaintiffs' negligence claim.

Second, Ms. Bartley's opinion in factually incorrect.  Chief Jones has testified that a reasonable Jail employee "would anticipate if Kirk had in fact taken the heroin he reported he did, he would probably be going through some type of withdrawal symptoms, yes."[75]  Dr. Andrews has testified likewise: "[W]e have many, many patients who come in who have just used heroin before entering the door.  Most of them will go through withdrawal.  It usually maximizes on day three."[76]  And an inmate housed with Kirk has testified: "If any medical professional saw the condition that Kirk was in, they would have immediately provided assistance. That he needed medical assistance for his withdrawal was obvious even to me."[77]  The County has not, and cannot, offer any evidence to rebut this fact.[78]

---

[75] Dreveskracht Decl., Exhibit 42, at 70-71.
[76] Dreveskracht Decl., Exhibit 16, at 55.
[77] Declaration of Marcus Mosley, at 2-3.
[78] Even assuming that no County employees observed Kirk exhibiting signs of opiate withdrawal—and Ms. Bartley cites no evidence for this assumption—this is only because they buried their heads in the sand with a constitutionally violative safety check policy, in violation of the standard of care for supervision in the corrections setting, a discussed above. *Cf. Makdessi v. Fields*, 789 F.3d 126, 129 (4th Cir. 2015) ("Prison officials may not simply bury their heads in the sand and thereby skirt liability.").

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 22

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

## IV.    CONCLUSION

Plaintiffs have searched far and wide for any issues of fact that might preclude summary judgment but have come up empty-handed.

Considering the above, Plaintiffs respectfully request that the Court grant partial summary judgment on their *Monell* and negligence claims.   There are no genuine issues of material fact regarding the County's: (1) policy and established practice of failing to provide duty direct-view safety checks; and (2) whether the County's duty was breached, and whether that breach was a proximate cause of Kirk's death.   The issue of damages should be determined by the jury at trial. *See, e.g., Drew*, 2017 WL 937146; *Coleman v. City of Chicago*, No. 12-10061, 2015 WL 8601702 (N.D. Ill. Dec. 14, 2015).

Respectfully submitted this 10th day of August 2021.

GALANDA BROADMAN, PLLC

 s/Ryan D. Dreveskracht

Ryan D. Dreveskracht, WSBA #42593
 s/Gabriel S. Galanda

Gabriel S. Galanda, WSBA #30331
Attorneys for Plaintiffs
P.O. Box 15146 Seattle, WA 98115
(206) 557-7509 Fax: (206) 299-7690
Email: ryan@galandabroadman.com
Email: gabe@galandabroadman.com

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1

## CERTIFICATE OF SERVICE

2        I, Wendy Foster, declare as follows:

3        1.     I am now and at all times herein mentioned a legal and permanent resident of the

4 United States and the State of Washington, over the age of eighteen years, not a party to the above-

5 entitled action, and competent to testify as a witness.

6        2.     I am employed with the law firm of Galanda Broadman PLLC, 8606 35th Avenue

7 NE, Ste. L1, Seattle, WA 98115.

8        3.     Today I served the foregoing document, via this Court's ECF system, on all

9 Defendants.

10       The foregoing Statement is made under penalty of perjury and under the laws of the State

11 of Washington and is true and correct.

12       Signed at Seattle, Washington, this 10th day of September, 2021.

13

14                             <u>s/Wendy Foster</u>
Wendy Foster

15

16

17

18

19

20

21

22

23

24

25

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 24

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509